*SUSAN JOHNSON, and the ESTATE OF GREGORY HAYES,*

*vs.*

*DAVIS COUNTY, SHERIFF TODD RICHARDSON, JOHN DOES 1-5,*

*in the*

*UNITED STATES DISTRICT COURT DISTRICT OF UTAH, CENTRAL DIVISION*

*CIVIL NO. 1:18-cv-00080-DB*

## EXPERT REPORT

## I.       INTRODUCTION

This is a report addressing the issues related to the care and custody on Mr. Gregory Hayes while housed in the Davis County Correctional Facility on December 13 and 14, 2017. This report is predicated upon the information outlined in the section "Materials Reviewed." Should additional information be disclosed that affects my opinions and conclusions, I reserve the right to alter my opinions and conclusions as necessary.

## II.      QUALIFICATIONS

I have been employed in the criminal justice system since 1984 when I began work with the Fayette County Detention Center in Lexington, Kentucky, as a Deputy Jailer. In 1985 I was assigned as Training Coordinator for the Fayette County Detention Center and began the development of a formal Pre-service and In-service Deputy Jailer training program for the jail. An area of additional assignment was the development, revision and maintenance of the Detention Center's policies and procedures. I remained in this position until 1992 when I assumed the position of Planning and Research Analyst at the Detention Center to develop and implement an objective jail classification system. This implementation included the development of a management information system infrastructure and programming to accomplish the goals of the jail classification system. I attained the position of Administrative Deputy, Senior (Deputy Director) for the Division of Detention in 1996 assuming increased levels of administrative responsibility that included a primary role in the planning, design and construction of a 1000+ Direct Supervision detention facility, combining the principles of Objective Jail Classification with Direct Supervision. Throughout my tenure I continued to perform the functions of a Deputy Jailer often wearing two, or more hats. Performing those essential job functions varied and diminished in frequency as the supervisory responsibilities within the agency increased.

In 2001, I was assigned the additional responsibility of contract development and management for privatized services (food, medical, mental health, commissary, inmate telephones) and various other projects. In 2004, I was assigned the development and supervision of the Lexington-Fayette Urban County Division of Community Corrections Bureau of Professional Standards which included Internal Affairs; Safety, Sanitation and Standards; and Administrative and Disciplinary Hearings. I retired from my last position in August 2008.

The Lexington-Fayette Urban County Division of Community Corrections provided local correctional custodial services to an in-custody population of offenders incarcerated for the full spectrum of criminal justice offenses from traffic offenses to violent felony offenses. The Division housed both pre-trial and sentenced offenders. The Division provided a range of community release programming, starting with court-ordered work release programs; community-service release programs; day reporting programs; and, county-based probationary services.

My consulting activities began in the early 1990's. I have been a certified instructor of correctional curriculum since 1985, and have been a FBI certified firearms instructor and a Federal Bureau of Prisons defensive tactics instructor. I have taught and consulted for the National Institute of Corrections since 1990, the American Jail Associa-

tion since 2004, and other criminal justice system consulting agencies. I have assisted in developing policies and procedures for jails throughout the country. I have conducted numerous classification system evaluations of mega-jails, large jails, medium jails and small jails in various states around the US for the National Institute of Corrections and other contractors. I am experienced in matters involving overall jail management including, but not limited to, such areas as the use of force; issues of security and operations; the provision of medical and mental health services; classification and inmate behavior management; contract management for privatized services (food, medical, mental health); management information systems; strip search; gang and security threat group management in jails. I have co-created and developed a new jail management paradigm – Mission Based Management. I received a Bachelor of General Studies in Social and Political Theory and a Doctorate in Public Administration. I have been a member of the Board of Directors for the American Jail Association and serve as Second Vice-President on the Executive Board. I am also on the faculty of the Americans for Effective Law Enforcement (AELE), where I instruct at seminars on topics of Inmate Classification, in-custody death prevention, Prison Rape Elimination Act and serve on the Editorial Board for AELE's publications.

In recent years, I have become involved in litigation consultation and expert witness work for both the plaintiff and the defense. These cases primarily involved strip search, classification, use of force, medical care, in-custody deaths and conditions of confinement. My opinions are given within a reasonable degree of professional certainty in those areas involving jail and correctional issues, acceptable correctional practice, correctional administration and correctional supervision.

**III.**      <u>**PUBLICATIONS**</u>

1.  "The Use of Force Continuum: Is it Worth Keeping?" (Part 2); Collins, William; Swartz, Jeffrey; and Leach, Donald, <u>Correctional Law Reporter</u>, May/June 2011

2.  "The Use of Force Continuum: Is it Worth Keeping?" (Part 1); Collins, William; Swartz, Jeffrey; and Leach, Donald, <u>Correctional Law Reporter</u>, December/January 2011

3.  "Arrestee Strip Searches: An Administrator's View", <u>Correctional Law Reporter</u>, July/August 2010

4.  "PREA Redux: What's It Going to Cost Us?", <u>American Jails</u>, Hagerstown: May/June 2010

5.  "PREA Redux: What's It Going to Cost?", <u>Correctional Law Reporter</u>, December/January 2010

6.  "Prison Rape Elimination Act Lives On", <u>Correctional Managers Report</u>, December/January 2009

7.  "Carrots versus Sticks: Managing Behavior in the Jail", – <u>American Jails</u>, Hagerstown: November/December 2008

8.  "PREA Draft Standards are PREA 'DAFT" Standards" –<u>Correctional Managers Report</u>, August 2008

9.  "Carrots versus Sticks: Managing Behavior in the Jail", –<u>Correctional Managers Report</u>, April/May 2008

10. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails", – <u>American Jails</u>, Hagerstown: November/December 2007; <u>LJN Exchange</u>, National Institute of Corrections, US Department of Justice, 2006; and <u>Corrections Professional</u>, November 2007

11. "Excited Delirium: Fact or Fiction", – <u>LJN Exchange</u>, National Institute of Corrections, US Department of Justice, 2007

12. "Are Tasers in Jails a Great New Tool or Another Headache", – <u>LJN Exchange</u>, National Institute of Corrections, US Department of Justice, 2006

13. "Mission Creep and the Role of the Jail in Public Health Policy" – <u>LJN Exchange</u>, National Institute of Corrections, US Department of Justice, 2004

14. "Creating a New Jail Management Paradigm", Kennedy-Western University, Published Dissertation, 2004

15. "Journey into Objective Jail Classification", Leach, Don and Sabbatine, Ray, <u>American Jails</u>, Hagerstown: January 1999

16. "A New Strip Search Paradigm", Leach, Donald and Sabbatine, Ray, <u>American Jails</u>, Hagerstown: November/December 1996

**IV.**        <u>**COMPENSATION**</u>

My rate of compensation is $250.00 per hour for research, consultation and report generation. My fee for depositions and trial testimony is $2500 per any part of a business day, video depositions are $5000 per any part of a business day, and $1000 per any part of a business day for travel, awaiting trial testimony or onsite consultation plus all reasonable expenses (travel, printing and duplication).

V.    **CASE HISTORY DISCLOSURE**

Cases in which I have testified in court or deposition in the past four years:

1. *Kevin Younger v. State of Maryland* (U.S. District Court, Middle District of Maryland, 24-C-17-0047S2 OC, 10/2019)

2. *William Dillon et al., v. Clackamas County and Craig Roberts* (U.S. District Court, District of Oregon, 3:14-cv-820-YY, 07/2019)

3. *Kevin Younger v. State of Maryland* (Circuit Court for Baltimore City, 24-C-17-0047S2 OC, 06/2019)

4. *Darcy Corbitt, Destiny Clark and John Doe v. Hal Taylor, Charles Ward, Deena Pregno and Jeanne Eastman,* (U. S. District Court, Middle District of Alabama, Northern Division, 2:18-cv-00091-MHT-GMB, 12/2018)

5. *Donald J. Hinson v. Sheriff Grady Judd; et al.,* (U. S. District Court, Middle District of Florida, Tampa Division, 8:17-CV-02039-JDW-MAP, 10/2018)

6. *Solomon Cindea v. Matthew Abbott, et al.,* (U. S. District Court, Northern District of Ohio, Eastern Division, 4:17-cv-02525, 09/2018)

7. *Debra Hopkins v. Board of Wilson County, Kansas, Commissioners, et al.* (U.S. District Court, District of Kansas, 2:15-CV-2071-CM-GLR, 08/2018)

8. *Michelle Kindoll v. Southern Health Partners, et al.,* (U. S. District Court, Eastern District of Kentucky, Northern Division at Covington, 2:17-CV-84-DLB-JGW, 07/2018)

9. *Rachel M. Hammers v. Douglas County, et. al,* (U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG 06/2018)

10. *James Barnes v. Sheriff John T. Boyd, LaPorte County Sheriff's Department, LaPorte County et al.,* (U. S. District Court, Northern District of Indiana, 3:16-CV-00190-RLM-MGG, 01/2018)

11. *Robert Moore v. Mason County, Kentucky and Mason County, et al., (*U. S. District Court, Eastern District of Kentucky, 2:16-CV-00185-DLB-CJS, 01/2018)

12. *Randy S. Hisey for James Merchant v. Woodbury County; et al.,* (U. S. District Court, Northern District of Iowa, Western Division, 7C16-CV-4111, 11/2017)

13. *Taylor Martin v. Miguel Huapilla, Dayton Gaston, Joseph Peaks and Michael Scott,* (U. S. District Court, Middle District of Florida, 2:16-cv-537-FTM-99MRM, 08/2017)

14. *Jose Luis Garza v. City of Donna, Texas,* (U.S. District Court, Southern District of Texas, McAllen Division, 7:16-CV-00558 05/2017)

15. *Anthony Waller v. Bradley Lovinger,* (U.S. District Court, District of Colorado, 14-CV-02109-WYD-NYW, 05/2017)

16. *Bradley Johansen v. Officer A.J. Cox and the City of Kent,* (U.S. District Court, Western District of Washington at Seattle, 216-CV-004160, 01/2017)

17. *Rachel M. Hammers v. Douglas County, et. al,* (U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG 08/2016)

18. *Charles Axl Rose v. McCreary County, et al.,* (U. S. District Court, Eastern District of Kentucky, 6:14-CV-00111-GFVT, 03/2016)

19. *Timothy Redmond, et. al. v. Scott Crowther, et. al.,* (U. S. District Court, District of Utah, 2:13-cv-00393DAK, 7/2015)

20. *Jerome Odom v. Steve Whidden,* (Twentieth Judicial Circuit, Florida, Civil Division, Number 2012-570-CA, 7/2015)

21. *Christina Bobbin v. Corizon Health, Inc., f/k/a Prison Health Services, Inc., et. al.,* Mike Scott, et. al., (U. S. District Court, Middle District of Florida, 2:14-cv-158-FtM-29DNF, 07/2015)

22. *Shana Bennett v. Hinds County, Mississippi, and John and Jane Does 1-100,* (U. S. District Court, Southern District of Mississippi, 3:14-CV-753-DNJ-FKB, 02/2015) consolidated with Damion Lewis and Derrick Lewis v Hinds County, Mississippi, John and Jane Does 1-100, (U.S. District Court, Northern District of Mississippi, 3:14-cv-450-TSL-JMR, 02/2015)

23. *Joseph Reilly v. Sheriff of Leon County, Florida,* (U. S. District Court, Northern District of Florida, 4:14-CV-00397-RH-CAS, 01/2015)

24. *FK.S., K.K., H.M., T.K., J.H., S.B., S.C., T.S., C.K., D.R., L.A., and M.L. v. City OF Puyallup, Police Chief Bryan Jeter, Lieutenant Edward Shannon*, (U. S. District Court, Eastern District of Washington, 3:13CV-05926, 12/2014)

25. *Oral Jason Murphy v. Clark County Sheriff's Office, Paul Gaudette, Tammy Webster,* (U. S. District Court, Eastern District of Missouri, 13-CV-1103, 11/2014)

26. *Frank Hyman v. City of Philadelphia, Warden Clyde Gainey, Deputy Warden Gerald May, Lieutenant Demond Anderson, Corrections Officers Dwayne Corley and Ryan Hoover,* (U. S. District Court, Eastern District of Pennsylvania, 10-499, 05/2014)

27. *Christina Smith v. Erie County Sheriff's Department; Erie County Board of Commissioners; Terry Lions; D. Todd Dempsey; Brittany M. Hausman; Sarah R. Worley; Jason A. Beatty; Kyle Bellamy; Linda Scroggy; and Perkins Township Board of Trustees (U. S. District Court, Northern District of Ohio, 3:12-CV-01853-DAK, 09/2013)*

**VI.**    **MATERIALS REVIEWED**

I reviewed the following materials in formulating my opinion in this case.

1. Amended Complaint and Jury Demand filed 03/18/2019

2. Booking Information-Hayes, Gregory dated 12/13/2017; 1920 hours

3. Clearfield Police Department, LAW Incident Table-Arnell, Heather dated 01/12/2018

4. Close Watch Log (blank)

5. CorEMR Reports-Hayes, Gregory

   5.1.    Full Patient History

6. Defendants' DuCivR 26-1(b)(1)(A) Expert Disclosures dated 12/2019

7. Depositions

   7.1.    Arnell, Heather dated 09/20/2019

   7.2.    Baer, Kelcie dated 08/.28/2019

   7.3.    Hatfield, Kenneth Ray dated 08/08/2019

   7.4.    Hayes, Andrew Scott dated 08/09/2019

   7.5.    Hayes, Matthew Scott 08/09/2019

   7.6.    Herndon, John W. Dated 08/08/2019

   7.7.    Kelly, Cheyenne dated 08/08/2019

   7.8.    King, Danna Marie dated 08/09/2019

   7.9.    Johnson, Susan Lee dated 08/09/2019

   7.10.    Layton, Daniel dated 05/09/2019

   7.11.    Mead, Austin Patrick dated 08/08/2019

   7.12.    Reid, Megan Jo dated 08/08/2019

   7.13.    Richardson, Todd Michael dated 05/09/2019

   7.14.    Welch, Kristin L. Dated 09/20/2019

8. Emails

   8.1.    "Drug Court Update," from Herndon, John dated 12/08/2017; 1505 hours

   8.2.    "Gregory Hayes Lawsuit," from Herndon, John dated 09/05/2018; 1158 hours

   8.3.    ""Re:Gregory Hayes pre plea DUI Court," from Herndon, John dated 12/14/2017; 0827 hours

9. Expert Report-Draper, Ted, MD FACEM FABAM dated 11/25/2019

10. Expert Report-Starr, Ken, MD FACEM FABAM dated 11/12/2019

11. Floor Diagram-Hand drawn

12. Incident Report, Clearfield Police Department dated 12/13/2017; 18:53:31 hours

13. Medical Screening Sheet-Hayes, Gregory dated 12/14/2017; 1805 hours

14. Officer's Reports, Davis County Sheriff's Office

    14.1. Baer, Kelcie dated 12/14/2017; 1005 hours

    14.2. Bateman, M. 12/14/2017; 0623 hours

    14.3. Burris, B. Dated 12/14/2017; 0634 hours

    14.4. Callister, W. Dated 12/14/2017; 0655 hours

    14.5. Dalley, A. Dated 12/14/2017; 0608 hours

    14.6. Fisher, B. Dated 12/14/2017; 0609 hours

    14.7. Hatfield, K. dated 12/14/2017; 0649 hours

    14.8. Kelly, C. dated 12/14/2017; 0638 hours

    14.9. Layton, D. Dated 12/14/2017; 0654 hours

    14.10. Lee, M. Dated 12/14/2017; 0643 hours

    14.11. Lundgreen, B. Dated 12/14/2017; 0624 hours

    14.12. Mead, A. dated 12/14/2017; 0915 hours

    14.13. Peasnall, J. dated 12/14/2017; 0559 hours

    14.14. Reid, M. dated 12/14/2017; 0559 hours

    14.15. Silver, K. Dated 12/134/2017; 0643 hours

    14.16. Slagowski, J. dated 12/14/2017; 0648 hours

    14.17. Townsend, M. Dated 12/14/2017; 0642 hours

15. Officer Report, Farmington City Police Department, Incident 12382616, Case 2017-002987 dated 12/14/2017

16. Plaintiff's DuCivR 26-1(b)(1)(A) Expert Disclosures filed 11/13/2019

17. Plaintiff's Supplemental Expert Disclosures dated 12/14/2019

18. Policy and Procedure Manual, Davis County Correctional Facility

    18.1. "Access to Treatment," 405.02

    18.2. "Chemically Dependent Inmates," 406.03

    18.3. "Continuity of Care," 405.13

    18.4. "Emergency Medical and Dental Care," 405.14

    18.5. "Grievance Mechanism," 405.08

    18.6. "Grievance Procedure," 520.00

18.7.    "Inmate Grievance Procedures," 409.07

18.8.    "Intoxication and Withdrawal," 406.02

18.9.    "Medical and Mental Health Services," 400.00

18.10.    "Medical Orders," 405.09

18.11.    "Medical/Suicide Screening," 301.02

18.12.    "Nurse Health Assessment," 405.03

18.13.    "Receiving Screening," 405.01

18.14.    "Records of Prisoner Care History and Progress," 160.03

18.15.    "Sick Call," 405.06

18.16.    "Staffing Levels," 402.04

18.17.    "Standing Orders and Protocols," 405.10

18.18.    "Suicide Prevention Monitoring (MEDWATCHES)," 406.08

18.19.    "Telephone Use," 501.00

18.20.    "Training for Healthcare Providers," 402.05

19. Report of Examination, Office of the Medical Examiner-Hayes, Gregory, Thomas, Lindsay C., MD dated 12/15/2017; 0925 hours

20. Site Visit-01/22/2020

21. Stock Drug Record-Hayes, Gregory

21.1.    Date received 03/26/2016

21.2.    Date received 11/05/2016

21.3.    Dated received 12/10/2016

22. Suicide Prevention Screening Form dated 12/14/20167; 1805 hours

23. Video recordings

23.1.    FILE0003 from Farmington.mov

23.2.    IMG_0673.mov

23.3.    Intake Prebooking

23.4.    Intake Hallway

23.4.1.   Dated 12/13/2017; 2024 hours

23.4.2.   Dated 12/14/2017; 0000 hours

23.4.3.   Dated 12/14/2017; 0100 hours

23.4.4.   Dated 12/14/2017; 0200 hours

23.4.5.   Dated 12/14/2017; 0300 hours

23.4.6.   Dated 12/14/2017; 0400 hours

23.4.7.   Dated 12/14/2017; 0500 hours

24. Voluntary Statement-Hayes, Andrew, Clearfield Police Department dated 12/13/2017

25. *Bell v Wolfish*, 441 U. S. Supreme Court, 520 (1979)

26. *Estelle v. Gamble*, 429 U.S. 97; 97 S. Ct. 285; 50 L. Ed. 2d 251; 1976 U.S. LEXIS 175, (1976)

27. *Farmer v Brennan* (92-7247), 511 U.S. 825 (1994)]

28. Core Jail Standards, 1st Edition, American Correctional Association, 2010

29. Correctional Health Care: Guidelines for the Management of an Adequate Delivery System, National Commission on Correctional Health Care, 3rd Printing July, 2009

30. Jail and Prison Legal Issues: An Administrator's Guide, William Collins, Esq., published by the American Jail Association, updated 2006

31. Performance-based Standards for Adult Local Detention Facilities, 4th Edition, American Correctional Association, June 2004

   31.1.   2016 Standards Supplement, American Correctional Association, 2016

32. Standards for Health Services in Correctional Institutions, 3rd Edition, American Public Health Association, 2003

33. Standards for Health Services in Jails, National Commission on Correctional Health Care, 2008

34. The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, William Collins, Esq., published by the Civic Research Institute, 2019

35. *Turner v Safley*, 482 U.S. 78 482 U.S. 78 (1987)

**VII.**      <u>**EXHIBITS TO BE USED TO SUMMARIZE OR SUPPORT OPINIONS**</u>

I may employ some, or all, of the materials referred to in the previous section to summarize or support my opinions. This report is predicated on the facts as presented through reviewing the provided materials.

**VIII.** <u>**FOCUS OF EXAMINATION**</u>

My review focused on the following issue:

*A.    Did the Davis County Sheriff's Office have acceptable correctional policies and procedures for the operation of the Davis County Correctional Facility as expected by a reasonable correctional administrator?*

*B.    Did the custody of Mr. Gregory Hayes while in the Davis County Correctional Facility on December 13 and 14, 2017, meet acceptable correctional practice as expected by a reasonable correctional administrator?*

**IX.**        <u>**OPINION**</u>

My opinion is predicated on a comprehensive review of the information listed in Section VI. My opinions are given within a reasonable degree of professional certainty in those areas involving jail and correctional issues, acceptable correctional practice, supervision and administration. I reserve the right to supplement or alter my opinion should additional information be received.

**A.**   ***The Davis County Sheriff's Office has acceptable correctional policies and procedures for the operation of the Davis County Correctional Facility as expected by a reasonable correctional administrator***

**B.**   ***The custody of Mr. Gregory Hayes while in the Davis County Correctional Facility on December 13 and 14, 2017, met acceptable correctional practice as expected by a reasonable correctional administrator.***

## X.     COMMENTS AND BASIS FOR OPINION

In preparing my opinion, I relied upon my training and experience in corrections as an officer, instructor and administrator along with training and information provided by attorney and correctional law expert Mr. William Collins, Esq. in Jail and Prison Legal Issues: An Administrator's Guide;[1] and more recently, in his book The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails.[2] Additionally, my opinions and basis for opinions reflect my continuing studies and research of correctional management issues. Those studies and research include frequent review of case studies, correctional articles[3] and participation in correctional conferences and workshops conducted by, the Americans for Effective Law Enforcement; Institute for the Prevention of In-custody Death; the American Jail Association, and the American Correctional Association, both as a presenter and as a participant.

My opinions arise from the information reviewed; are the product of that review; reflect relevant professional duties; standards of care; and, accepted practices in the field of corrections. Any reference to court opinions and/or use of legal terms reflects my training and experience in the correctional profession and as a correctional practices expert. My reference to cases or use of any terms that have a specific legal definition is not intended to express any legal expertise beyond the scope of my experiences and training as a correctional officer, and correctional administrator, and as used by a knowledgeable correctional administrator in operating that which the Courts have determined to be a Constitutionally-based correctional facility. This would include the management and oversight of secure correctional facilities and community-based correctional components; such as, operating a day reporting center; adult probation services; court ordered work-release programs.

In corrections, agency policies and practices are intended to conform to Constitutionally-based duties; applicable state regulatory standards; and standards of care and training. Supervision is intended to ensure knowledge and application of those Constitutional duties by correctional staff. Policy is a guideline enacted through procedures that are intended to demonstrate Constitutionally-based acceptable correctional practices. The various correctional duties, standards of care and accepted practices have all evolved over time, illustrating "the evolving standards of decency that mark the progress of a maturing society."[4]

The phrase "acceptable correctional practice" refers to how objectively reasonable correctional professionals perform, or should perform, their duties based on legal policy codified and adopted into policy and procedure, that is published, trained and supervised. "Acceptable correctional practice" does not refer to "best practice" or "ideal practice", but rather to those situations and practices that correctional personnel confront as part of their customary duties. They generally fall within a range of options available to the officer in any given situation.

---

[1] Jail and Prison Legal Issues: An Administrator's Guide, William Collins, Esq., published by the American Jail Association, updated 2006

[2] The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, William Collins, Esq., published by the Civic Research Institute, 2019

[3] Correctional publications that I routinely read and review provide current thoughts, issues, problems, solutions, relevant case law include the *Correctional Manager's Report*; the *Correctional Health Care Report*; the *Correctional Law Reporter*; the *Correctional Mental Health Report*; *American Jails* magazine; Jail and Prisoner Law Bulletin; AELE Monthly Law Journal; and *Corrections Today* magazine.

[4] *Estelle v. Gamble*, 429 U.S. 97; 97 S. Ct. 285; 50 L. Ed. 2d 251; 1976 U.S. LEXIS 175, (1976)

XI.    **ANALYSIS**

>    ***Davis County Correctional Facility Policies and Procedures***

>    The policies and procedures of the Davis County Correctional Facility, (DCCF) and especially those governing the screening, assessment and intake processes, meet acceptable correctional practices as would be expected by a reasonable correctional administrator. The Correctional Facility has policies and procedures intended to screen, assess and identify arrestees entering the facility with serious medical needs. For example, the DCCF has policies governing the "Receiving Screening"[5] of new arrestees, querying the new arrestee regarding medical needs, mental health needs and suicidality issues. This arrestee screening is also addressed in the policy "Medical/Suicide Screening."[6] The DCCF has appropriate policies for managing arrestees and inmates demonstrating signs and symptoms of withdrawal and detoxification from drugs and alcohol.[7]

>    The policies referenced above, like the majority of jail policies, reference both the American Correctional Association's (ACA) Performance-based Standards for Adult Local Detention Facilities (ALDF), and/or the National Commission on Correctional Healthcare's (NCCHC) Standards for Health Services in Jails. For example, the policy on "Receiving Screening" references the NCCHC standard J-31 (now J-E-02), "Receiving Screening."[8] Both the ACA's ALDF Standards and the NCCHC's Standards are purely voluntary. The decision by the Davis County Sheriff's Office to adopt these, at least through reference, provides a policy that exceeds acceptable correctional practices.

>    **_Intake Processing of Mr. Hayes_**

>    The intake processes employed by Deputy Kelcie Baer during the intake of Mr. Gregory Hayes on December 13, 2017 reflected the custom and practices of the DCCF at that time. These were practices were acceptable correctional processes. Deputy Baer was voluntarily working overtime the evening when Mr. Hayes was brought into the facility by the arresting officer, Officer Heather Arnell.

>    Coincidentally, Deputy Baer had an extensive personal and professional history with Mr. Hayes. Deputy Baer had numerous contacts with Mr. Hayes during his previous incarcerations. In fact, in his most recent incarceration, Mr. Hayes worked as an inmate worker under her supervision. Deputy Baer had daily contact with Mr. Hayes for the almost two month period of time he served prior to being released earlier in the day on December 13, 2017. Deputy Baer had observed Mr. Hayes previous presentations-being both sober and intoxicated-during the period of time she was in contact with him. This prior knowledge influenced and impacted her decisions when conducting the intake processing of Mr. Hayes. There is no indication that at any point in time did Deputy Baer perceive Mr. Hayes' level of intoxication to be problematic.

>    "Tell me about this booking.

>    This booking?

>    Uh-huh.

---

[5] Policy and Procedure Manual, Davis County Correctional Facility, "Receiving Screening," 405.01

[6] Ibid, "Medical/Suicide Screening," 301.02

[7] Ibid, "Intoxication and Withdrawal," 406.02

[8] Standards for Health Services in Jails, National Commission on Correctional Health Care, 2008, p. 60

I booked him. When he came in, he came in with John Herndon from the county attorney's office. And at the time of the booking, there was another combative inmate that came in. And Deputy Solie put him in a cell because Gregory Hayes was compliant with everything. So Deputy Solie, I believe, put him in a cell. We dealt with the combative inmate. And while the male officers were dealing with the combative inmate, I split over and started booking Gregory Hayes because prior to this booking, the booking that he was just barely released on the morning of, **he was an inmate worker. And my position up until two weeks ago was the inmate worker deputy. And he was an inmate worker, so I knew him very well.**

Okay.

So I called him over to me and I booked -- I did the whole booking process with him. **And I told him if he slept through the night, didn't cause intake any issues, I'd make him a worker if medical cleared him the next day because he had just barely got released.**

Okay.

S**o he finished the booking process with me. No issues whatsoever. I gave him a blanket, and Deputy Solie and I put him in the cell.** And I walked some other inmates back to housing. And I left for the night because by this time it was later in the night. And I went home." [9] (Emphasis added)

While Deputy Baer clearly perceived Mr. Hayes as being intoxicated during the intake process, it seems equally clear that she did not perceive his level of intoxication to present a serious medical need as obvious to a layperson. Deputy Baer documented this in her report of the incident.

"Inmate Hayes was lethargic and seemed to be under the influence of something during the booking process **but was able to answer every question.** During his pat down, Deputy Solie had to help Hayes keep his hands on the counter but Hayes was able to stand on his own. **Once the pat down was completed, he was then escorted into the intake area where his photo was taken and the rest of the booking questions were asked**." [10] (Emphasis added)

A review of the video from the Prebooking Area camera shows Mr. Hayes entering and moving about the Prebooking Area without difficulty. At points in the Prebooking Area video, Mr. Hayes can be observed bending down and removing both his shoes and socks without difficulty; showing little sign of significant impairment, such as stumbling, or falling over and catching himself. Mr. Hayes can be seen on the video standing without assistance at the booking counter.

On the video provided by Probation Officer John Herndon, [11] Mr. Hayes can be heard answering the questions being posed by Deputy Baer without difficulty. Mr. Hayes appears to be sufficiently oriented to space, place and time, to participate in the intake processes. On the video Mr. Hayes appears to fully comprehend the questions being posed and his custodial situation. Mr. Hayes is sufficiently aware of his surroundings that he even "mugs" for the camera, blowing a kiss to the camera. Clearly, Mr. Hayes perceived he was being recorded; accordingly, there is no reason to believe that he did not understand the questions being asked by Deputy Baer or that he had ingested a dangerous

---

[9] Deposition-Baer 26/14-25; 27/1-17

[10] Officer's Report

[11] IMG_0673.mov

level of drugs. Mr. Hayes was able to fully participate in the intake processes, answering the questions posed by Deputy Baer.

It also seems obvious that Deputy Baer did not perceive Mr. Hayes to be at risk arising from his level of intoxication. Based upon her rapport with Mr. Hayes arising from their previous interactions, Deputy Baer clearly thought Mr. Hayes would simply require a place to lie down, and in the morning, she was going to reinstate his inmate worker status. Deputy Baer's future orientation regarding Mr. Baer's availability appears to indicate she did not perceive him to be showing obvious signs or symptoms of distress.

"So did you have any idea why Gregory Hayes was being rebooked into jail?

I asked Gregory Hayes.

Okay. And what did he say?

He told me that his parents -- his mom called the cops on him. His mom and his brother, I believe, called the cops on him. But I didn't ask him anything more as to why other than that. **And that's when I told him, "Well, if you sleep through the night, I'll come get you and make you a worker if medical will clear you.**"[12] (Emphasis added)

When Deputy Baer received sxtwo pill containers, she processed them using the protocol that was in place at that time. The pill bottles were placed into a box located at the officer's workstation within the intake area for retrieval the next morning by medical staff. While it must be acknowledged that a more prudent course of action would be timely notification of medical of the pill container intake, there is no indication that Deputy Baer connected the pill containers as being the basis for Mr. Hayes' intoxication. Deputy Baer was just following established protocol.

Deputy Baer's processing of Mr. Hayes from the Prebooking Area to Intake Holding Cell 5 also arose from her not perceiving Mr. Hayes as showing obvious signs or symptoms of distress, but that Mr. Hayes only wanted place to lie down. As a result, Deputy Baer, having this personal/professional relationship with Mr. Hayes, selected a cell furthest from the noise and activity of the intake and booking area so that he could rest peacefully.

"And then I saw that he was -- Gregory Hayes was booked into a holding cell; is that correct?

I don't know where you're seeing that.

That might not be in this log.**But where was -- where did you end up putting Gregory?**

**In I-5. Okay. And that is — Intake cell, cell No. 5.**

And that's in the screening area?

It's in the intake area, yes.

Okay. And would that be unusual to put somebody that —

No.

What would you use those cells for?

They're just holding cells.

---

[12] Deposition-Baer 30/9-18

Okay. So if -- I think it says here that intake was full, maybe. The intake —

The booking area was full.

Okay. The intake area was full. would put somebody in I-5?

No. **The intake area was full, loud. I wanted him to get some sleep, so I put him in a cell so I could come back and get him in the morning.**"[13] (Emphasis added)

And,

"And just to clarify this, you didn't put him in there **because of concerns about his intoxication**?

No. **I was coming back to get him and make him a worker. He was supposed to go to sleep. The next morning I was coming to get him to take him to medical to be screened and be a worker.**"[14] (Emphasis added)

This was an act of consideration on the part of Deputy Baer for the welfare and custody of Mr. Hayes. On the Intake Hallway video for the 2000 hour period, Deputy Baer can be seen escorting Mr. Hayes to Intake Holding Cell 5. On the video, Mr. Hayes does not appear to be demonstrating any difficulty in his movement down the hallway to the holding cell.

Simply showing signs of intoxication would not have led a reasonable correctional officer to believe that the individual is presenting a serious medical need. It is the level of intoxication that creates concern for the welfare of the individual. A large majority of arrestees entering a jail demonstrate some signs of intoxication without also showing signs of serious medical need obvious to a layperson. Some of these signs would include the inability to participate in the intake processes (not understanding the questions; not being able to speak coherently; falling asleep during the questioning; being unconscious; being unable to stand without assistance; being unable to walk without assistance; etc.) While Mr. Hayes appeared intoxicated, he did not demonstrate any of the above listed inabilities to participate in his processing.

Additionally, Mr. Hayes did not inform Deputy Baer, or any other DCCF staff member that he had ingested a dangerous amount of drugs. While the arresting officer, Officer Arnell, was aware of the potential ingestion of a dangerous amount of drugs,[15] she did not inform Deputy Baer of that fact. In fact it was Officer Arnell who cancelled the Emergency Care Unit dispatched to Mr. Hayes' brother's house.

"I made contact with Gregory who was sitting at the kitchen table. Gregory was lethargic, groggy, perspiring, and had slurred speech. Gregory said he is fine and that he is doing what he is supposed to be doing. I asked Gregory if he wanted any medical attention and he said, no, he is fine and doesn't need any help. **I then told dispatch to cancel medical as Gregory was refusing any medical attention.** I asked Gregory what medications he has taken and he said he took his what his doctor wrote his prescription as. Gregory said he took 3 pills of clonazepam today. **I asked if I could see Gregory's medicine bottle. I observed Gregory's bottle as filled on 10/18/2017 with 30 pills and the prescribed dose was essentially 1-2 pills as needed for anxiety. If Gregory already took 3 pills today then he is self-medicating and not taking the pre-**

---

[13] Ibid, 32/17-25; 33/1-16

[14] Ibid, 35/7-12

[15] Clearfield Police Department, LAW Incident Table-Arnell, Heather dated 01/12/2018, "Narrative"

**scribed dose.** Gregory then stated he had taken 2 sleeping pills." (Emphasis added)

The ECU was contacted by Mr. Andrew Hayes after speaking with Probation Officer John Herndon.

"Jail Booking records show Gregory was released at 1318 hrs on 12/13/17. At around 1847 hrs that evening Andrew called me saying he needed help, he said Gregory had been released and came to stay at his house, as soon as he got home he asked to borrow his cell phone and Gregory went outside and was talking to someone on phone for about 20 mins. Andrew told me Gregory was now high on drugs and was tearing up the house and believed it was because he was able to get some drugs from somebody after he got out of jail, **I told him to call 911. A police officer called me soon after saying Gregory under the influence and was refusing medical treatment. Gregory was abusing drugs and disorderly** (a violation of his conditional release of abstaining from misuse of any drugs or alcohol and no further criminal charges). I asked the police officer to transport Gregory to the jail where I could meet them and place him on a 72 hour hold. **At the jail Gregory was able to walk and talk**."[16] (Emphasis added)

And,

"Andrew called me. He was -- he seemed to be excited. He was -- said that he was afraid because his brother was tearing up the place. His brother was high and he didn't know what to do, and he wanted me to come get him. And I told him, you know, I'm not going to come get him. **You're going to need to call 911.** If he's committing, you know, a crime, tearing up the place and if he's of control, and if he is high, then he needs to call the police, because they're a lot closer, they're quicker than when I could get there, and they, you know, could hopefully calm the situation down."[17] (Emphasis added)

And,

"So now I need to go back to you meeting them in the jail, and them being Greg and the officer that arrested him. You're there because he's in your program and you're his tracker. Fair statement?

Fair.

And **you're concerned about what is going down while he's going through this intake process. That's why you take the video.**

(Witness nods head.)

Right?

Well, partly to -- n**ot only that, but to show the team that I have this individual who appears to be under the influence and** —

So it's a combination of documenting that he's under the influence of this drug. He's obviously drugged. It's also, I think you mentioned earlier, that **you wanted to document that he was responding, answering questions? Yes.**"[18] (Emphasis added)

---

[16] Email, "Gregory Hayes Lawsuit," from Herndon, John dated 09/05/2018; 1158 hours

[17] Deposition-Herndon 14/2-14

[18] Ibid, 26/20-25; 27/1-14

And, showing that Probation Officer Herndon failed to provide this critical information to Deputy Baer, is his admission that he did not participate beyond videoing the intake processes.[19]

"So I'm thinking that you're saying you're just really trying to create an accurate picture, in spite of or because of the client. You have your job and interests and responsibilities to protect, and you're protecting your client. The officer is doing everything. Everybody is in this intake. **The intake, they're trying to get the information. Everybody wants to get it right.** Okay. So it would seem to me that **more information is better**. And so I'm wanting to know **how active you were in conveying to this intake person what the history was of Greg showing back up there that day**.

**I was not active at all.** I just documented what I had.

And that was it?

And talking with Mr. Hayes. **I did not have any kind of interaction with the booking deputy or -- not very much even with the arresting officer**."[20]

It seems evident that Deputy Baer was hamstrung in providing timely access to a secondary medical assessment for potential drug overdose by the failure of both Officer Arnell and Probation Officer Herndon failing to provide her with critical information. They possessed critical information regarding the telephone call between Mr. Andrew Hayes and Probation Officer Herndon that resulted in Mr. Andrew Hayes calling for an ECU to assess his brother, Gregory. They possessed critical information regarding the waving off of the ECU response, instead opting to transport Mr. Gregory Hayes to the jail. These were affirmative actions on the part of the arresting officer and the probation officer that deprived the jail of critical information regarding Mr. Hayes level of intoxication and/or multiplicity of drugs within his system. The qualified medical provider on duty that evening, RN Daniel Layton, articulated that had he been aware that an Emergency Care Unit had been called, then waved off, he would have refused to accept custody of Mr. Hayes; instead requiring Mr.Hayes be taken to a local hospital Emergency Room for assessment.

"Did you know that they had originally called an ambulance, and when the deputy came to his door, they **waved off the ambulance and brought him to the jail**? Did you know about that?

**No. I wish I did, but no.**

How would that have changed your treatment if you'd have known these kind of things?

**We would have sent him out if we'd known. If there was any indication that he needed an ambulance, we would have done that.**

So you didn't know about that. **Did you know that Andrew, his brother, said, Hey, he's high, he's been taking all these drugs and —**

**No.**

You didn't know about that

---

[19] A review of the Prebooking video shows that Probation Officer Herndon actually took two video recording with his cell phone.

[20] Deposition-Herndon 28/14-25; 29/1-7

No."[21] (Emphasis added)

Given Deputy Baer's clear concern for Mr. Hayes custody, as documented earlier in this report, it would be reasonable to assume that she might have acted differently had this information been provided to her at the time of Mr. Hayes medical questioning in the intake processing.

### *Intake Holding Cell 5-Care of Mr. Hayes*

The first concern for Mr. Hayes welfare while in Holding Cell 5 arose when, while conducting a routine welfare observation, Deputy Megan Reid perceived Mr. Hayes to be in some distress. This occurred at approximately 0022 hours on December 14, 2017. Video from the Intake Hallway shows Deputy Reid summoning assistance and entering the cell.[22]

"On 12/14/2017 around 0059 I noticed Hayes was laying in cell 5 breathing heavy so I asked RN Daniel to come and take a look at him."[23]

It appears clear from the video of the Intake Hallway that neither Deputy Reid nor the responding male deputy identified the situation as an emergency; rather, Deputy Reid contacted medical staff with her concern that they check Mr. Hayes medical condition. This appears to have been done more out of an abundance of caution than any identified need. This is a common practice that I used many times when supervising inmates under my care. A reasonable correctional administrator would want, and expect, staff to show a concern for the welfare of those under their supervision.

"So moving to the next paragraph, just looking at the first sentence. Around midnight, **Deputy Reid checked on Gregory and noticed that he was breathing heavy** and his skin appeared blueish.

Uh-huh (affirmative).

**You wanted to make sure that he was okay, so you called the registered nurse, Daniel Layton, to come and check on him. That's what you did, right?**

**Yes.**

Okay.

But it wasn't that he was breathing heavy. So that -- it was that he -- the type of breathing.

Okay. Explain, because this says breathing heavy. Is that maybe not described well?

So the type of breathing that it was -- **I have a daughter that was born really early, and she has sleep apnea, and it's pretty severe. So if she falls asleep for a nap or something on the couch and she doesn't have her device, then she does a breathing that -- it's like she'll breathe in, and then nothing,** and then it's like a -- that's what it sounded like. It sounded like a -- like he had sleep apnea."[24] (Emphasis added)

---

Deputy Reid applied her personal familial experience to her care and custody of Mr. Hayes. She did not identify an immediacy of need, just to take appropriate measures to ensure Mr. Hayes was medically sound as assessed by a qualified medical provider, Registered Nurse Daniel Layton.

"At the time that you were called at 1:00, did you have the benefit of talking to any of these people whose statements we've read about what they're observing, that he was obviously intoxicated? I mean have you had the opportunity to talk to them, is kind of what I'm asking. I know you were aware of it somehow, but do you remember a conversation with any of them?

I don't.

**What you knew is that they were concerned about his intoxication and he was having a problem —** he was blue, I guess. What did you do?

They said they were concerned about his breathing.

**What did you see when you got there? What was he like?**

**His breathing was slow. He was hunched over and he was occluding his airway. So we straightened him out so that his airway was straight. Breathing returned to normal.**

Okay.

**And we got a set of vitals, and the vitals were great.**"[25]

And,

"Initially, as I said, he was hunched over, so as soon as we straightened him out, everything — breathing returned to normal. You're right, I didn't mark it, but breathing returned to normal, vitals were good. **So I wasn't concerned at that point, because everything was in normal limits.**

At least what you took.

Yes.

**Whatever vitals you did take were within normal limits?**

**Yes.**"[26] (Emphasis added)

It is evident that the custody staff, Deputy Reid, was concerned for the well-being of Mr. Hayes. Then, without identifying Mr. Hayes as having an immediacy need, and with an absence of any signs and symptoms of distress, Deputy Reid and Nurse Layton continued about their respective duties; except that Deputy Reid and the custody staff increased the frequency of observations of Mr. Hayes. Below is a timeline with significant events identified from the Intake Hallway video timestamp.

### *12/13/2017*

- 9:06 pm-observation by unidentified deputy

- 9:16 pm-observation by unidentified deputy

---

[25] Deposition-Layton 14/15-25; 15/1-3

[26] Ibid, 15/24-25; 16/1-

- 9:19 pm-observation by unidentified deputy

- 9:46 pm-observation by unidentified deputy

- 9:54 pm-observation by unidentified deputy

- 10:34 pm-observation by unidentified deputy

- 11:58 pm-observation by unidentified deputy

### *12/14/2017*

- *0:22 am-Deputy Reid concerned for Hayes showing possible signs/symptoms of distress, second officers shows up to assist*

- 0:25 am-Deputy Reid enters cell;

- 0:26 am-Deputy Reid and second deputy closes door and walks away

- 0:45 am-Deputy Reid back at cell

- 0:54 am RN Layton enters cell, Deputy Reid waits outside

- 0:57 am-All exit cell

- 1:03 am-observation by unidentified deputy

- 1:30 am-observation by unidentified deputy

- 2:00 am-observation by unidentified deputy

- 2:02 am-observation by unidentified deputy

- 2:13 am-observation by unidentified deputy

- 2:14 am-observation by unidentified deputy

- *2:22 am-Deputy Kelly concerned for Hayes showing possible signs/symptoms of distress; immediate staff response*

- 2:24 am RN Layton response to the cell; retrieves crash cart from staff break area

- 3:02 am-Deputy Reid checks

- 3:02 am-observation by unidentified deputy

- 3:04 am-observation by unidentified deputy

- 3:22 am-Deputy Reid checks

- 4:04 am-Deputy Reid checks

- 4:21 am-Deputy Kelly checks

- 4:21 am-observation by unidentified deputy

- 4:25 am-observation by unidentified deputy

- 4:26 am-Deputy Reid and another staff; appears tone speaking with Mr. Hayes

- 4:43 am-unidentified deputy walks by the cell, stops, turns around and goes to Hayes cell and looks in

- 4:44 am-Deputies Reid and Kelly stop at cell, look in

- 5:10 am-observation by unidentified deputy; check into cell, nothing observed

- *5:30 am-Sergeant Hatfield discovers Hayes in distress; calls for medical*

It appears from the observed checks, that after the initial concern by Deputy Reid, the staff increased their observations. This is how Mr. Hayes was discovered showing obvious signs and symptoms of distress by Deputy Kelly at 0222 hours. Deputy Cheyenne Kelly's identifications was the result of incidental viewing of the cell by a passing officer. Incidental viewing is when officers, staff, medical, are walking by cells they make a concerted effort to look into the cell; even it is outside their assigned areas. Such was the case for Deputy Kelly; she was assigned to the Housing Area 4 (female housing area) and was down in the intake area on a break. More incident, issues and self-harming behaviors are identified via incidental viewing than on scheduled observation rounds. The fact that Deputy Kelly incidentally observed Mr. Hayes, perceived signs and symptoms of distress, while apparently returning to her assigned duty post, is commendable.

On the video, Deputy Kelly and the custody staff respond immediately to Mr. Hayes cell. Two minutes later, Nurse Layton arrives at the cell to provide medical care services. The custody staff appropriately deferred to the qualified medical provider for the care of Mr. Hayes, who determined that this was not a medical emergency.

"And then they're calling you back again a few hours later. **What did they tell you this time, this 3:00 visit?**

**It was similar. It was his breathing had slowed. But when I got there, he was hunched over again and he was restricting his airway. So I straightened him back out**.

What was his color like?

He was a little bit bluish tint, because his breathing was slow. So I straightened him out. Color returned to normal. Breathing returned to normal. **Vital signs were good.**

When you left him the second time, was his respiration kind of back like you left him the first time? I mean, was it better or was it worse? Could you observe that? It's not recorded, but do you remember if it got worse or better?

When I first came, the breathing was slow.

Yes.

Once we straightened him out —

Yes.

 -- he -- breathing was normal pattern.

**And the second time, how was it different, if it -- or was it?**

**It wasn't any different.**

**About the same thing?**

**About the same. Vital signs were still consistent.**"[27] (Emphasis added)

The response of custody staff and medical staff to what Deputy Kelly perceived as a sign or symptom of distress was immediate and the appropriate correctional practice. The response was what a reasonable correctional administrator would have wanted from the custody and medical staff.

Reviewing the timeline above, it is clear that the custody staff again increased their welfare observations of Mr. Hayes. Some observations were minutes apart. For example, in the hour before Mr. Hayes was discovered unresponsive (4a to 5a) he was checked seven time by custody staff. Mr. Hayes was checked by custody staff just 20 minutes before he was found unresponsive in his cell.

When Sergeant Hatfield conducted a welfare observation on Mr. Hayes at 0530 hours, he identified signs and symptoms of distress. Once again, this was an incidental viewing of Mr. Hayes by Sergeant Hatfield as he was attending a shift briefing.

"I checked on him through out the night and the last check I did was at approximately 0530 when I was leaving intake to go to briefing. I looked into 1-5 and noticed Hayes laying on the floor and **I did not notice him breathing.** I called his name a couple of times and no response . I yelled down the hall to open 1-5, the door was opened and Deputy Reid responded and held the cell door open. I entered the cell and shook Hayes and got no response . Deputy Reid called for a 10-78 on the radio, and I also called 10-78 medical to 1-5 and stated **Inmate Hayes appears not be breathing** . Numerous deputies responded . Nurse Daniel and Nurse Celesta both responded. Deputy Reid went to call for an ambulance and paramedics."[28]

The response by custody and medical staff to Mr. Hayes medical emergency at 0530 hours on December 14, 2017, was immediate and met acceptable correctional practice.

---

[27] Deposition-Layton 16/16-25; 17/1-18

[28] Officer's Report-Hatfield, Kenneth dated 12/14/2017; 0649 hours

**XII.**   <u>**REPORT CONCLUSION**</u>

The death of Mr. Gregory Hayes is a tragedy. Critical medical information about Mr. Hayes potentially taking a dangerous amount of drugs was withheld from jail staff conducting the intake processing. Without this vital information, custody staff, Deputy Kelcie Baer, was left to make her decisions regarding the care and custody of Mr. Hayes based upon the information Mr. Hayes provided her, and her observations of Mr. Hayes. Deputy Baer processed Mr. Hayes according to custom and practices of the Davis County Correctional Facility at that time. There is no indication that Deputy Baer perceived Mr. Hayes to be in medical distress during the conduct of the booking processes. Custody staff appropriately monitored Mr. Hayes through the night of December 13, 2017, and the early morning hours of December 14, 2017. Custody staff deference to the medical staff recommendations for Mr. Hayes medical care is an acceptable correctional practice as expected by a reasonable correctional administrator. When custody staff perceived Mr. Hayes might be demonstrating signs and symptoms of distress, the response from both custody and medical staff was immediate and met acceptable correctional practice.

The policies and procedures of the Davis County Correctional Facility meet acceptable correctional practices as expected by a reasonable correctional administrator.

I reserve the right to supplement or alter my opinion should additional information be received.

Donald L. Leach II

January 27, 2020