Michael W. Homer (#1535)
Jesse C. Trentadue (#4961)
Sarah Jenkins Dewey (#15640)
**SUITTER AXLAND, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT   84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
E-Mail: mhomer@sautah.com
E-Mail: jesse32@sautah.com
E-Mail: sjenkins@sautah.com

*Attorneys for Davis County Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| SUSAN JOHNSON, for herself and on behalf of minor child X.H., MR. HAYES, and the ESTATE OF GREGORY HAYES, | : : : : : | **DAVIS COUNTY AND SHERIFF TODD RICHARDSON'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**[1] |
| Plaintiffs, | : : | |
| DAVIS COUNTY, SHERIFF TODD RICHARDSON, DANIEL LAYTON, JOHN DOES 1-5, | : : : | Civil No. 1:18-cv-00080-DB |
| | : | Judge Dee Benson |
| Defendants. | : : : : | **ORAL ARGUMENT REQUESTED** |

---

[1] Dkt. 74.  Plaintiffs stipulated to the dismissal of their punitive damages claim against Davis County, and to dismissal of their claims against former Sheriff Richardson in his official capacity. Dkt. 83, p. 36.

## REBUTTAL TO PLAINTIFFS' FACTS

A.   **Plaintiffs' Responses**:

*Defendants* supported their *Motion* with 160 paragraphs of facts. Plaintiffs only dispute a few of them. The facts they did not dispute or otherwise conceded are: (1) *Hayes* had been incarcerated many times at the Jail and given back his Clonazepam and Buprenorphine upon release without incident;[2] (2) *Hayes* told Officer Arnell that he had taken three Clonazepam tablets and two Tylenol tablets but he did not tell her that he had taken Buprenorphine and Olanzapine;[3] (3) *Hayes'* prescribed dosage of Clonazepam was 1-2 pills as needed for anxiety;[4] (4) neither Arnell nor Herndon could possibly have told the Jail's staff that Hayes had also taken both Buprenorphine and/or Olanzapine because they did not know;[5] (5) on the evening of December 13, 2017, *Hayes* was not going through withdrawal;[6] (6) it is common for Utah a jail not to have a member of the facility's medical staff present at booking;[7] (7) Baer, based upon her training and experience, used her "sound judgment" to determine if someone was too intoxicated to be booked into the Jail without a medical evaluation, which included the detainee being able to walk on their own and answer her questions;[8] (8) *Hayes* had two pill bottles in his possession on intake, an empty bottle of Clonazepam and an over-the-counter bottle of Tylenol PM

---

[2]  *Statement of Facts* ¶¶6 and 8.
[3]  *Id.* ¶41.
[4]  *Id.* ¶42.
[5]  *Id.* ¶¶57-58.
[6]  *Id.* ¶60.
[7]  *Id.* ¶75.
[8]  *Id.* ¶95.

containing pills;[9] (9) people frequently experience sleep apnea when taking sleeping medications, it is not a hospital emergency, it is a common problem in jails, and typically treated by waking the inmate and reposition them to enhance their airways; [10] (10) *Hayes* never told Officer Arnell, his probation officer Herndon or Sergeant Baer all of the medications that he had taken;[11] (11) the levels of medication found in *Hayes'* blood at autopsy were not extremely elevated;[12] (12) preceding *Hayes'* death, his vital signs were checked twice by medical staff and found to be within normal limits;[13] (13) the Clonazepam bottle showed that the prescribed dosage was 1-2 tablets as needed;[14] (14) *Hayes* told Baer that he had taken only a normal dose of his anxiety medication, Clonazepam;[15] (15) *Hayes* never told Baer that he had taken Tylenol ;[16] (16) many people are booked into the Jail with empty prescription medication bottles in their possession;[17] (17) Baer and the other Jail staff who interacted with *Hayes* did not know that he had been released from the Jail earlier that day with 23 tablets of Clonazepam and 19 tablet so Buprenorphine;[18] (18) no one told the Jail staff that *Hayes* had taken Clonazepam, Buprenorphine and Olanzapine along with Tylenol; [19] (19) the Jail's staff reasonably attributed Hayes' drowsiness to the medication he had taken and his difficulty breathing and skin

---

[9] *Id.* ¶97.
[10] *Id.* ¶¶143-145.
[11] *Id.* ¶147.
[12] *Id.* ¶148
[13] *Id.* ¶¶122 and 129.
[14] *Id.* ¶98a.
[15] *Id.* ¶98b.
[16] *Id.*¶98e.
[17] *Id.* ¶98d.
[18] *Id.* ¶98h.
[19] *Id.* ¶98g.

discoloration to sleep apnea; [20]  (20) *Hayes'* death resulted from respiratory failure caused by the combined depressant effects upon his Central Nervous System of the medications he had taken, the normal deep-sleep he would have experienced around 5:00 AM, his breathing difficulties and his increased sensitivity to Buprenorphine, Clonazepam and Olanzapine due to having discontinued the use of these medications while incarcerated;[21]  and (21) without the overall depressant effect upon his Central Nervous System caused by all of the foregoing factors, the levels of Buprenorphine and Clonazepam found in *Hayes'* blood at autopsy would not have proven fatal to him.[22]

     **B.**    <u>**Objections**</u>:

In their response to *Statement of Facts* submitted by *Defendants'* in support of their *Motion for Summary Judgment*, Plaintiffs attempt to manufacture a case of deliberate indifference based upon facts which, even if those facts were undisputed and they are not, are irrelevant. Plaintiffs, for example, claim that *Defendants'* purported failure to comply with the American Correctional Association ("*ACA*") and the National Commission on Correctional Health Care ("*NCCHC*") standards on jail admissions and inmate health care as well as the Jail's policies on these same matters constitutes deliberate indifference. The *ACA* and *NHCCHC* are voluntary organizations devoted to improving the corrections system.[23]   Their proposed

---

     [20] *Id.* ¶142.
     [21] *Id.* ¶161a.
     [22] *Id.* ¶161b.
     [23] See:
http://www.aca.org/ACA_Prod_IMIS/ACA_Member/About_Us/Our_History/ACA_Member/AboutUs/AboutUs_Home.aspx?hkey=0c9cb058-e3d5-4bb0-ba7c-be29f9b34380 and
https://www.ncchc.org/

standards and recommendations are without the force of law as are the Jail's own policies. *Defendants'* failure to implement and/or to observe these standards or policies do not provide the foundation for a civil rights violations,[24] which even Plaintiffs' correctional expert, Tom Green, conceded when he admitted in his expert report that the *ACA* and/or *NCCHC* standards "**ARE NOT CONSTITUTIONALLY REQUIRED**." [25]

Plaintiffs also attempt to fabricate a deliberate indifference claim against *Defendants* based upon medical malpractice or negligence by asserting that the Jail's correctional staff was negligent in responding to Hayes' medical needs, including booking him into the Jail, and that the staff's acts or omissions are somehow imputed to *Defendants*, which is likewise irrelevant. These facts are irrelevant because: (a) medical malpractice does not rise to the level of a civil rights violation;[26] (b) negligence, including gross negligence, will not support a civil rights claim;[27] and (c) the acts and omissions of the correctional staff, who are non-parties, cannot be imputed to *Defendants* because there is no vicarious liability under § 1983.[28]

Therefore, Plaintiffs' responses to the following paragraphs of fact set forth by *Defendants* in their *Motion* are irrelevant for one or more of the above stated reasons: 12, 30, 33, 56, 59, 61, 63, 67, 68, 69, 72, 76, 79, 105, 106, 108, 110, 111, 113, 119, 124, 130, 133, and

---

[24]   *See Davis v. Scherer*, 468 U.S. 183, 194-96 (1984); *Herring v. Keenan*, 218 F.3d 1171, 1180 (10thCir. 2000); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).   The fact that Plaintiffs are even advancing this theory means that Richardson should be entitled to *qualified immunity* as a matter or law since it has never been heretofore established that the violation of national standards or a jail's internal policies would constitute a §1983 violation.

[25]   *Green Report*, Dkt. 77-12, p. 2 (emphasis added).

[26]   *See Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996).

[27]   *See Barrie v. Grand County*, 119 F.3d 862, 869 (10th Cir. 1992).

146a,b,d,e,g,h,j.  *Defendants* will not speak further to Plaintiffs' responses to these particular

paragraphs other than to state that as set for in their *Motion for Summary Judgment*,[29] these facts

were fully supported by the cited record and undisputed.

C.     **Defendants' Rebuttal**:

With respect the paragraphs of fact that Plaintiffs attempt to contest, each is summarized

below, and will be followed by a summary of Plaintiffs' "Response" and *Defendants*'

"Rebuttal," including any objections to Plaintiffs' response.

7.     The Jail's medical staff noted that the prescribed doses of *Hayes'* medications

were not high enough to cause him problems with withdrawal.   **Response**: Disputed. Upon his

incarceration in October of 2017, *Hayes* told the medical staff that he was experiencing

withdrawal. **Rebuttal**: Irrelevant. It is undisputed that *Hayes* was not experiencing withdrawal

from medication when rebooked into the Jail on the evening of December 13, 2017.

\*     \*     \*

27.     There is no evidence as to how long *Hayes* had been waiting for Andrew or if he

met anyone prior to Andrew's arrival at the Jail, which is significant because one of the drugs

that contributed to his death was "Olanzapine" about which no one had any knowledge.

**Response**: Disputed. There is no evidence that *Hayes* obtained Olanzapine from anyone.

**Rebuttal**: Irrelevant. Olanzapine was not one of the medications returned to *Hayes* when he was

released from Jail. *Hayes* clearly had taken Olanzapine and it contributed to his death.

---

[28] *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

\*   \*   \*

43.     *Hayes* did **NOT** take all twenty-one of the Clonazepam tablets that he had in his possession when release from the Jail a few hours earlier.   **Response**: Disputed. Andrew Hayes never identified the unconsumed pills that he found after his brother was arrested. **Rebuttal**: Irrelevant. The medication levels found in *Hayes'* blood at autopsy were not extremely elevated, even 20mg of Clonazepam is not a lethal dose, and the level of Clonazepam found in *Hayes'* blood was also not consistent with his having consumed the entire bottle.[30]

\*   \*   \*

55.     Arnell did not inform any of the Jail staff about having considered taking *Hayes* to the hospital.   **Response**: Baer never questioned Arnell about *Hayes*, which is contrary to both the Jail's written policy and the *ACA* and *NCCHC* national standards.     **Rebuttal**: Irrelevant. Baer never saw Arnell because Herndon brought *Hayes* into booking. The purpose of having the booking officer speak with the arresting officer is to find out "whether or not the person has used drugs, and he might know the specific drugs used,[31] and Arnell did not know that *Hayes* had also taken Buprenorphine or Olanzapine so Baer would have learned nothing by speaking with her.

\*   \*   \*

57.     *Hayes* told no one that he had also taken Buprenorphine and/or Olanzapine. **Response**: Undisputed that *Hayes* never disclosed that he had taken Buprenorphine and Olanzapine.   But this fact would not have altered Baer's screening of *Hayes* since he told her

---

[29] Dkt. 74 at pp. 8-42.
[30] *Tubb Dec.*, Ex-C ¶¶20 and 25.
[31] *Policy 405.01(M),* Ex-K.

7

that he taken 16mg of Clonazepam, which was more than 16 times his normal dose. **Rebuttal**:
Irrelevant. This is also speculation as to what effect this knowledge would have had upon Baer's
decision to admit *Hayes* into the Jail.   What is not speculation, however, is that *Hayes* told Baer
that he had taken his normal dose of Clonazepam; that he met **all** of the criteria for admission
without a medical screen in that *Hayes* could walk, talk, and answer her questions; and did not
exhibit signs, symptoms or other indications that he needed a medical evaluation.

*     *     *

71.     If the Jail refuses to accept every incoming inmate because he or she was under
the influence of drugs or alcohol, then very few people would be going to jail, which is why the
correctional staff at the Jail are trained how to assess an incoming inmate under the influence of
drugs or alcohol for acceptance.   **Response**: Disputed.   The Jail can accept intoxicated inmates
provided that they are medically screened and monitored in accordance with the national
standards.   Correctional staff also receive no training on how to medically screen inmates.
**Rebuttal**: Irrelevant. Correctional staff, who are not health care providers, are not trained on
how to medically screen a detainee for admission to the Jail, but they are trained on how to
screen an intoxicated detainee for referral to the medical unit for further examination before
admission. As part of its unwritten policies, the Jail had criteria for booking offers to use in
assessing whether an intoxicated person should be referred to the facility's medical staff prior to
his or her admission into the Jail,[32] and the criteria for admission without a medical evaluation
was whether the inmate could walk, talk on his or her own and answer the booking officer's

---

[32]   *Baer Depo*., Ex-G, at 8-12.

8

questions.   If the detainee did not meet all of these requirements, medical was called.[33]

\*     \*     \*

73.     Prior to *Hayes'* death, there had never been an inmate having gone through this screening process who died of an overdose in the Jail; hence there was no reason for *Defendants* to suspect that the Jail's booking policies and procedures, including the training given the staff, were constitutionally deficient. **Response**: Disputed.   There have been eight inmate deaths between January 1, 2014 through December 31, 2017. **Rebuttal**: Irrelevant. Other than *Hayes*, none of these deaths were due to a drug overdose,[34] and with respect to training, Plaintiffs have the burden to prove a history of tortious conduct (*i.e*., prior deaths due an overdose) so as to put *Defendants* on actual or constructive notice that their screening procedure were substantially certain to result in Hayes' overdose and death,[35]  which they have not done.

\*     \*     \*

84.     Herndon testified that during booking *Hayes* was not disoriented either when walking or talking, and that he could stand.   **Response**:   Disputed. Officers described *Hayes* as being obviously under the influence of drugs at booking, "struggling to follow simple commands and would fall asleep while taking to screening officers."   **Rebuttal**: Irrelevant. It is undisputed that *Hayes* was obviously under the influence of drugs or alcohol when booked into the Jail. However, it is also undisputed that although lethargic *Hayes* "walked in under his own power

---

[33]     *Id.*at 12-13. *See also Layton Depo*., Ex-N, at 17; *Richardson Depo*., Ex-M, at 18, 36 and 39.

[34]     *See Supplemental Response* to Interrogatory No 18, Exhibit 1 hereto.

[35]     *Bryson v. City of Oklahoma City*, 627 F.3d 784, 789(10th Cir. 2010). In the case of Richardson, Plaintiffs had to show actual notice because the constructive notice applies only to

and answered the booking officer's questions."[36]   Furthermore, Plaintiffs claim that *Hayes* was falling asleep during booking and struggling to follow simple commands is not true. What Plaintiffs have cited to support this fact is how *Hayes* appeared at approximately 1:00 AM on the morning of December 14, 2017, when Nurse Layton attended to him for sleep apnea.[37]

\*   \*   \*

94.     *Hayes* told Baer that he had taken a normal dose of his medication, Clonazepam.

**Response**: Disputed.   *Hayes* told Baer that he had taken two anxiety medications, including 16 mg of Clonazepam when the prescription bottle in his possession showed that his normal dosage was 1 mg. *Hayes* stated drug consumption, therefore, was 16 time his normal daily dosage.

**Rebuttal**: Irrelevant. The 1 mg dosage was taken from another prescription given the Hayes in May of 2017, and it was 1 mg as needed, not his daily dosage of that drug,[38] which *Hayes* told Baer was "**16mg of medication for anxiety every day**."[39]   The dosage on the bottle of Clonazepam in *Hayes'* possession when booked into the Jail on December 13, 2017, was 1-2 tablets as needed and not per day as Plaintiffs claim.[40] The record likewise does not support Plaintiffs' claim that *Hayes* told Baer that he had taken two difference anxiety medications. [41]

\*   \*   \*

---

municipal defendants. *See Farmer v. Brennan*, 511 U.S. 825, 840-41(1994).
[36] *Hatfield Report,* Ex-B, HAY000050.
[37] *Reid Report,* Ex-B, HAY000039.
[38] *Drug Record,* Ex-B, HAY000007.
[39] *Baer Report,* Ex-L. (emphasis added).
[40] *Arnell Report,* Ex-F p.3.
[41] *Baer Depo.,* Ex-G p. 24.

96.     The Jail security video camera in the booking area has been physically filed of record.[42] It shows that *Hayes* was able to walk on his own, answer Baer's questions, and even bend down to remove and put back on his shoes and socks during a search. **Response**: "The video speaks for itself." **Rebuttal**: The videotape clearly and conclusively rebuts Plaintiffs' claim that *Hayes* was so intoxicated at booking that he should have been either sent to the emergency room or given an immediate medical screening prior to his admission into the Jail. In other words, notwithstanding Plaintiffs' experts' opinions, *Hayes'* condition at booking is as shown on that videotape.[43]

*   *   *

98c.     *Hayes* told Baer that he had taken 16 milligrams of Clonazepam,[44] and that this was his "normal dose".   **Response**: Baer had no medical training and the significance of having consumed 16 mg of Clonazepam would not have been obvious to her.   *Hayes'* normal daily dosage was 1 mg and he also had in his possession an empty bottle of Tylenol PM.   Baer should also have known that *Hayes* obviously did not take his normal dosage of Clonazepam because he was returned to Jail for having abused his prescription medication. **Rebuttal**: Irrelevant. The bottle of Tylenol PM was not empty.[45] *See also* rebuttal to paragraph 94 above regarding dosage.

*   *   *

146c.   The amount of medication that *Hayes* told Baer and others that he had taken would not have alerted an officer, nurse or layperson to take him to the hospital.

---

[42] Dkt. 67.
[43] Exhibit 2 hereto are instructions for viewing the Jail's videotapes. (Dkt. 67 and 68).
[44] *Baer Depo.*, Ex-G p.3; *Baer Report*, Ex-L.

11

**Response**: Disputed. *Hayes* should have been medically screened in accordance with national standards and Jail policy.   The correctional staff also should have sent *Hayes* to the hospital once he exhibited blue skin and difficulty breathing because these were symptoms of an overdose. **Rebuttal**: Irrelevant. There is also no evidence that *Hayes'* symptoms were consistent with those of an overdose; whereas the evidence is undisputed that his symptoms were consistent with sleep apnea.

\*   \*   \*

146f.   *Hayes* failed to appropriately notify the Jail's custody and nursing staff of the drugs he had taken, which resulted in his death.   **Response**: Undisputed.   However, intoxicated persons are "not the most reliable sources of information."   Baer also did not speak with Officer Arnell about *Hayes'* drug consumption, which was against Jail policy as well as national standards, and she should likewise have had *Hayes* medically screened pursuant to national standards and Jail policy.   **Rebuttal**: Irrelevant.   Arnell did not bring *Hayes* into the booking area.   Hayes never told Arnell, or anyone, about the Buprenorphine or Olanzapine that he had taken.   Thus, if she had spoken with Arnell, Baer would not have heard about any of the other medications ingested by *Hayes*.

\*   \*   \*

146i.   There is no evidence that having taken *Hayes'* vital signs every 30-minutes and housing him in the Jail's medical unit would have changed the outcome.

**Response**: Disputed.   Dr. Starr opines that Hayes' death was easily preventable in a monitored

---

[45] *Farmington Police Report*, Ex-A, HAY000086.

setting with appropriately trained staff.   **Rebuttal**: Irrelevant.   Dr. Starr's opinion is also

conclusory and, therefore, should not be considered by the Court.

*   *   *

156.     *Hayes* also had a history of breathing difficulties, including sleep apnea and

airway obstruction. **Response**: Disputed. This fact is not supported by the record actually cited

by *Defendants*. **Rebuttal**: Plaintiffs are correct. The correct citation is: *Hanson Dec*, Ex-O, ¶14.

In addition, Dr. Tubbs stated that Layton correctly diagnosed and treated *Hayes* for sleep

apnea.[46]

**REBUTTAL TO PLAINTIFFS' STATEMENT
OF ADDDITIONAL FACTS**

As additional facts, Plaintiffs incorporate by reference the facts submitted by them in

support of their *Cross-Motion for Summary Judgment*. In response, *Defendants'* incorporate by

reference both their objections to those facts and responses to those facts contained in the

*Memorandum* submitted in opposition to Plaintiffs' *Cross Motion for Summary Judgment.*[47]

**ARGUMENT**

I.      **Davis County is Not Liable for the Violation of Hayes' Constitutional Rights**.

Plaintiffs must prove both that Davis County "executed a policy or custom" and that

policy or custom "caused [Hayes] to suffer deprivation of constitutional or other federal

rights."[48] "A municipal policy or custom may take the form of . . . an informal custom

---

[46] *Tubbs Dec.,* Ex-C ¶¶ 29 and 39.
[47] Opposition to Plaintiffs' *Motion for Partial Summary Judgment*, Dkt. 82.
[48] *Spradley v. LeFlore Cty. Detention Ctr. Pub. Trust Bd.*, 764 Fed. Appx. 692, 703 (10th Cir. 2019) (quoting *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009)).

'amount[ing] to "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'". . . or the 'failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'"[49]

Plaintiffs only alleged that Davis County failed to train or supervise employees,[50] but in their *Opposition to Motion for Summary Judgment*, they argue that the County had an informal custom.[51] They do not, however, address the second element of municipal liability—that this custom was unconstitutional and therefore violated Hayes' rights—nor could they because "custom" mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law.[52] To establish municipal liability under the theory of an informal custom or practice, a plaintiff must prove: (1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by . . . employees; (2) Deliberate indifference to or tacit approval of such misconduct by the . . . policymaking officials . . . after notice to the officials of that particular misconduct; and (3) That the plaintiff was injured by virtue of the unconstitutional acts pursuant to . . . custom and that the custom was the moving force behind the unconstitutional acts."[53]

Rather than proof, Plaintiffs argue that "Davis County operated under an informal policy

---

[49] *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)(citation omitted).
[50] Dkt. 27.
[51] Dkt. 83 at 26 – 28.
[52] *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003).
[53] *Christiansen v. West Valley City*, 2015 WL 3852647, No. 2:14-CV-25, at *3 (D. Utah June 22, 2015) (quoting *Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cty., Kan.*, 996 F.2d 1035, 1041 (10th Cir. 1993)).

of screening intoxicated inmates without the use of medically trained staff, refusing to medically assess these inmates, and then failing to regularly monitor the inmates upon admission."[54]  And they further assert that "these screening processes" were "widespread," without further analysis.[55]  Neither of these statements amounts to evidence of an informal policy resulting in a violation of *Hayes'* constitutional rights, however.

What Davis County had — as explained in its *Motion for Summary Judgment* —were policies about what admitting deputies should look for in intoxicated individuals brought to the Jail. Signs and symptoms such as "confusion or disorientation, hallucination or delirium, inability to stand or walk, slurred speech, very rapid or shallow breathing, lethargy, severe agitation or aggressiveness, sudden collapse, dilated or pinpoint pupils, restlessness, track or needle marks on arms or legs, and feelings of being very hot or very cold" would signal a booking officer that the inmate needed to be looked at and cleared by a physician. Officers were instructed to use their "judgment and common sense," and to follow the walk, talk and understand criteria, which is what Baer did when *Hayes* was booked. She knew him well from his previous incarceration, and she testified that he met all of the criteria for admission without a medical screening: was able to walk on his own, answer her questions, and did not show any signs or symptoms of needing a physician's evaluation is supported by video evidence.

The Tenth Circuit made a crucial distinction in *Martinez v. Beggs* as to the level of intoxication where it becomes unconstitutional to book an inmate.[56]   In a prior case, *Garcia v.*

---

[54] Dkt. 83 at 26.
[55] *Id.*
[56] 563 F.3d 1082 (10th Cir. 2009).

*Salt Lake County*, [57] the Court had upheld a jury verdict that found section 1983 liability "based on deliberate indifference of the county policy of admitting unconscious [and intoxicated] persons into the jail and the jail's medical staff deficiencies." The *Martinez* Court noted that "Garcia was unconscious for many hours [and defendants] took no action to attend to his obvious medical needs." In *Martinez*, the individual "was conscious, on his feet, argumentative, and cognizant that he was being arrested," exhibiting "characteristics that are common to many intoxicated individuals." Despite being intoxicated, "[n]othing in the record indicate[d] that [the individual] exhibited symptoms that would predict his imminent heart attack or death." [58] Simply being intoxicated was not sufficient symptoms to predict the arrestee's death and so it did not violate his constitutional rights to admit him to Jail without medical screening.

     *Defendants* addressed Plaintiffs' failure to train or supervise allegations in their *Motion for Summary Judgment.* A "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[59] "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [employees] come into contact.'"[60] Plaintiffs only allege a lack of training, not that the training amounted to deliberate indifference. Nor do they explain how a lack of training caused a deprivation of Hayes' constitutional rights.

     Plaintiffs must also show that the custom or lack of training was the cause of the alleged deprivation of *Hayes'* constitutional rights. Not only have Plaintiffs failed to show sufficient

---

[57] 768 F.2d 303(10th Cir. 1985).
[58] *Martinez,* 563 F.3d at 1091.
[59] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

evidence of an informal custom or a failure to train, they have failed to show that these alleged policies were the cause of a deprivation of *Hayes'* constitutional rights. Plaintiffs argue, too, that the County was deliberately indifferent to Hayes' serious medical needs because it "refused to fulfill its gatekeeper role despite the substantial risk to intoxicated inmates."[61] But gatekeeper liability is not municipal liability. It applies to individuals and requires the same subjective component of the deliberate indifference analysis.   Thus, "[t]he subjective element 'requires the plaintiff to present evidence of the prison official's culpable state of mind.' . . . 'Gatekeeper' prison officials may be liable for a deliberate indifference claim where they intentionally deny or delay access to medical care, or intentionally interfere with treatment."[62]   Rather than a gatekeeper role, the questions is whether a municipality "had actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[63]  Plaintiffs argue that the "County's failure to abide by its own policies (and national standards) put intoxicated inmates at substantial risk and therefore constitutes deliberate indifference."[64] But again, this is not the law,[65] which Plaintiffs' own expert admitted when he said that the *ACA* and *NCCHC* standards "are not constitutionally required."

In an attempt to escape the opinion of their own expert, Plaintiffs argue that it was

---

[60] *Id.* (Quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[61] Dkt. 83 at 29.

[62] *Dawson v. Lloyd*, 642 F. App'x 883, 884–85 (10th Cir. 2016) (citations omitted).

[63] *Bryson*, 627 F.3d at 789.

[64] Dkt. 83 at 29.

[65] *See Margheim v. Buljko*, 855 F.3d 1077, 1084 (10th Cir. 2017) ("Section 1983 does not allow plaintiffs to create a federal case out of 'every violation of state common law.'"

17

enough that the County knew inmates would be presented to the Jail in an intoxicated state and that the violation of *Hayes'* constitutional rights was a "highly predictable or plainly obvious consequence" of not medically screening intoxicated inmates as they were booked.[66] But Plaintiffs ignore the fact that eighty percent of inmates are intoxicated when they are booked,[67] and there is no evidence that, other than *Hayes*, any of them died of an overdose. They also ignore that Jail policy tasked deputies with looking for signs and symptoms of distress in an intoxicated inmate; to follow the walk, talk and respond to questions criteria for booking without a medical evaluation; and that the booking officer did not see any signs or symptoms that raised an alarm about admitting *Hayes*.

## II.   Sheriff Richardson is Entitled to Summary Judgment.

Plaintiffs must "show an 'affirmative link' between" Richardson's actions or failure to act and the alleged violation of *Hayes'* constitutional rights.[68] Plaintiffs, therefore, must show "(1) personal involvement; (2) causation; and (3) state of mind."[69] To do this, Plaintiffs cherry pick the policies that they believe Richardson should have enforced and Deputy Baer should have followed when *Hayes* was booked.[70] A violation of these policies, however, is irrelevant to the issue of Richardson's alleged deliberate indifference.   Yet, the fact that these policies existed

---

(quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004)).
   [66] *See Bryson*, 627 F.3d at 789.
   [67] *See Richardson Depo.*, Ex-M at 20–21,
   [68] *See Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) (citation omitted).
   [69] *Id.* (citation omitted).
   [70] To support their premise that "Sheriff Richardson can be liable for his conduct (creating policies)," Plaintiffs quote *Nordwall v. PHC-Las Cruces, Inc.* Although the language in *Nordwall* seems appropriate, the case makes clear that it is describing deliberate indifference under the *Rehabilitation Act*—not a § 1983 claim. *See* 960 F. Supp. 2d 1200, 1217 (D.N.M.

is relevant to the issue of deliberate indifference insofar at these policies address the screening and admission of intoxicated detainees, which means that there was no deliberate indifference because policies were in place.

Plaintiffs must also show that Richardson (1) was "aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed]"; (2) "actually drew that inference"; and (3) was "aware of and fail[ed] to take reasonable steps to alleviate that risk."[71] To do this, Plaintiffs argue that *Hayes*' death from mixed drug toxicity was a "highly predictable" outcome of Richardson's failure to require medical screening of all intoxicated inmates at booking. But they offer no evidence that it was highly predictable or that Richardson had any information from which to draw such an inference. Richardson estimated that eighty percent of inmates are intoxicated at booking,[72] and he implemented policies to address the problem.   Moreover, there is no evidence that, other than *Hayes*, an intoxicated inmate died or even had medical complications when admitted under the Jail's screening policies.

## CONCLUSION

Summary Judgment should be entered as requested by *Defendants,* and the Court should decline to exercise its supplemental jurisdiction over Plaintiffs' *Third Case of Action*.

DATED this 23rd day of June, 2020.

SUITTER AXLAND, PLLC

  /s/ Michael W. Homer  
*Attorneys for Davis County Defendants*

---

2013).
[71] *Keith v. Koerner*, 843 F.3d 833, 848 (10th Cir. 2016).
[72] *See Richardson Depo.,* Ex-M p. 20-21.

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2020, I electronically filed the foregoing document with the U.S. District Court for the District of Utah.   Notice will automatically be electronically mailed to the following individual(s) who are registered with the U.S. District Court CM/ECF System:

Daniel M. Baczynski, Esq.
Tad D. Draper, Esq.
Law Offices of Tad D. Draper, P.C.
12339 South 800 East, Suite 101
Draper, Utah 84020
Dbaczyn2@gmail.com
Legaljustice3@gmail.com
tdrapertad@gmail.com
*Attorneys for Plaintiffs*

                    /s/ Michael W. Homer