IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SUSAN JOHNSON, for herself and on behalf of minor child X.H., MR. HAYES, and the ESTATE OF GREGORY HAYES, <br><br>        Plaintiffs, <br><br> v. <br><br> DAVIS COUNTY; SHERIFF TODD RICHARDSON; DANIEL LAYTON; JOHN DOES 1-5, <br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [74] DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING [97] PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Case No. 1:18-cv-00080-DBB <br><br> District Judge David Barlow |

Before the court are the parties' cross motions for partial summary judgment.[1] The parties seek summary resolution of two causes of action under 42 U.S.C. § 1983 and do not argue the merits of a separate cause of action under the Utah Constitution.[2] In their briefing, Plaintiffs agreed to dismiss claims against Defendant Sheriff Todd Richardson, in his official capacity, and to dismiss punitive damages claims against Defendant Davis County.[3] Having reviewed the evidence, the briefing, and relevant law, the court rules as follows.

---

[1] ECF Nos. 74, 97. Plaintiffs original summary judgment motion, ECF No. 75, was amended on February 3, 2021. *See* ECF No. 97. Accordingly, the earlier motion at ECF No. 75 is terminated.

[2] Plaintiffs' first and second causes of action are for relief under 42 U.S.C. § 1983 and their third cause of action seeks relief under Article I, Section 9 of the Utah Constitution. *See* Amended Complaint, ECF No. 27 at 8, 10, 12.

[3] Plaintiffs' Amended Opposition to Motion for Summary Judgment, ECF No. 98; *see* ECF No. 27 at 11 ¶¶ 10, 49, 57.

# BACKGROUND

*The Incident*

On October 19, 2017, Gregory Hayes was booked into the Davis County Jail.[4] The booking officers took from Hayes the prescription medications in his possession, which included a total of twenty-three clonazepam tablets and nineteen buprenorphine tablets.[5] Hayes had been incarcerated multiple times before and had become an "inmate worker," so some of the jail staff knew him quite well.[6]

On December 13, 2017, the State of Utah's Second Judicial District Court ordered Hayes' release.[7] The jail released him, returning his prescription medications.[8] John Herndon, Hayes' probation officer, arranged to have Hayes live with his brother Andrew Hayes.[9] Andrew Hayes picked Hayes up from the jail and took him to Andrew Hayes' house.[10] Later that day, Hayes learned that his estranged wife was dating someone else.[11] That evening, Andrew Hayes called Herndon and told him that Hayes was "high" and that he didn't know what to do.[12] Andrew Hayes then called 911 and an ambulance, and police arrived a short time later.[13]

---

[4] ECF No. 72, Exh. A to Defendants' Motion for Summary Judgment at HAY0127.

[5] *Id.* at HAY0003, 9.

[6] ECF No. 73, Exh. G, Baer Depo. at 26–27; *id.*, Exh. H, Reid Depo. at 45–46.

[7] ECF No. 72, Exh. A at HAY0037.

[8] *Id.* at HAY0003, 36; ECF No. 73, Exh. M, Richardson Depo. at 73–76.

[9] ECF No. 72, Exh. B, Andrew Hayes Depo. at 16–17. To avoid confusion, the court refers to Andrew Hayes only by his full name and refers to Gregory Hayes as Hayes.

[10] *Id.* at 21.

[11] *Id.* at 26–27.

[12] *Id.*; ECF No. 72, Exh. D, Herndon Depo. at 13–14, 42–43; *id.*, Exh. B at 33.

[13] ECF No. 72, Exh. B at 26–27, 34.

Officer Heather Arnell responded to the call and requested that an ambulance stand by.[14] Arnell observed Hayes' behavior as "lethargic, groggy, perspiring, and had slurred speech."[15] Arnell asked Hayes if he wanted medical attention and Hayes refused, saying he was fine and did not need help.[16] Arnell then told dispatch to cancel the ambulance.[17] Hayes told Arnell that he had taken three clonazepam tablets and two over-the-counter sleeping pills.[18] His clonazepam prescription indicated he should take one or two pills per day as needed for his anxiety.[19] During a search of Hayes' person by another officer, Arnell observed some blue sleeping pills fall out of Hayes' pocket.[20] Officer Arnell spoke to Herndon because Hayes may have been abusing his prescription medications, possibly in violation of probation orders.[21] Assuming the police had criminal charges against Hayes, Herndon asked Arnell to take Hayes to jail and indicated he would meet them there.[22] Arnell arrested Hayes and transported him to Davis County Jail where they met Herndon.[23]

Herndon did not have much interaction with the arresting officer or the booking officer at the jail, but he had a short discussion with Hayes while awaiting Hayes' booking.[24] Hayes told Herndon that he took two of his prescription clonazepam.[25] Herndon described Hayes as slow at

---

[14] ECF No. 73, Exh. E, Arnell Depo. at 9–10.

[15] *Id.*

[16] *Id.*, Exh. E at 11; *see id.* Exh. F; ECF No. 72, Exh. B at 38.

[17] ECF No. 73, Exh. E at 11; *id.*, Exh. F.

[18] *Id.*, Exh. E at 25, 26; *id.*, Exh. F.

[19] ECF No. 73, Exh. E at 26.

[20] *Id.* at 28.

[21] *Id.* at 13; *see id.*, Exh. F (the Arnell police report).

[22] ECF No. 72, Exh. D at 43–4; ECF No. 73, Exh. E at 14; *id.*, Exh. F.

[23] ECF No. 73, Exh. E at 15.

[24] ECF No. 72, Exh. D at 29, 33.

[25] ECF No. 66, IMG_0671.MOV (video taken by Herndon of a brief discussion with Hayes).

answering and sweating.[26] Herndon requested a 72-hour hold order on Hayes from the Second

District court, and that request was granted.[27]

Sergeant Kelcie Baer booked Hayes into the jail on the evening of December 13, 2017.[28]

Baer estimated that about 95% of those being booked into Davis County Jail are intoxicated.[29]

Intake officers are trained to use sound judgment to determine "is this just normal intoxication,

or do we need to get medical up here to evaluate?"[30] To determine an inmate's level of

intoxication, Baer would assess "if they can walk into intake, talk on their own," and answer

processing questions.[31] If the inmate could not answer these questions, Baer would call medical

staff to respond.[32] When asked about medications, Hayes told Baer that he takes one and a half to

two tablets of medication each day and that they are 8 milligrams each, for a total of 16

milligrams.[33] Hayes told Baer this was his normal dose.[34] Baer did not recall the name of the

medication, though Hayes came in with two medication bottles and they were provided to

medical staff.[35] Baer "could tell that [Hayes] took his medications, but he was compliant with"

Baer's requests.[36] "[Hayes] had to have help putting his hands on the counter in front of him, but

---

[26] ECF No. 72, Exh. D at 33, 35, 36.

[27] *Id.* at 16; *id.*, Exh. A at HAY0184.

[28] ECF No. 73, Exh. G at 19.

[29] *Id.*

[30] *Id.* at 15.

[31] *Id.* at 12.

[32] *Id.*

[33] ECF No. 66, IMG_0673.MOV (video taken by Herndon of Hayes answering Baer's questions at intake).

[34] ECF No. 73, Exh. G at 25.

[35] *Id.* at 24. The bottles were prescription clonazepam and a bottle of over-the-counter sleep aid, Tylenol PM. ECF No. 72, Exh. A at HAY0086.

[36] ECF No. 73, Exh. G at 29.

he answered all of [Baer's] questions perfectly fine."[37] The intake officers tried but were unable to obtain a urinalysis sample from Hayes.[38] After completing the intake process, Baer gave Hayes a blanket and put him in an intake cell.[39] He was not admitted to the facility's general population.

Officer Reid arrived at the jail on the evening of December 13, 2017, and Hayes was already asleep.[40] The intake form which Baer had filled out earlier did not raise any red flags for her, because it simply indicated that Hayes had taken his anxiety medication, and it is common for inmates to be on medication.[41] Reid had known Hayes for a long time "and wanted to see how he was doing," so she checked on him more frequently than the jail policy requires.[42] The hallway video shows Reid checked on Hayes 14 times during the night.[43] Other jail personnel, including Officer Lee, checked on Hayes as well: "Throughout the shift, whenever I passed intake, I visually checked the cell and Hayes was sleeping on the floor breathing, his chest was rising and falling."[44] In total, the hallway video shows jail personnel checking on Hayes 32 times during the night, usually by stopping and looking into Hayes' cell, but sometimes by entering the cell as well.[45]

---

[37] *Id.*

[38] ECF No. 72, Exh. A at HAY0066.

[39] ECF No. 73, Exh. G at 27.

[40] *Id.*, Exh. H at 9. In a contemporaneous report, Reid wrote that staff had been watching Gregory because during intake "he was struggling to follow simple commands and would fall asleep while talking with us." ECF No. 73, Exh. A at HAY0039. However, Reid testified that she was not present during the intake and that these descriptions were passed on to her. ECF No. 73, Exh. H at 24–25.

[41] Exh. H at 13.

[42] *Id.* at 25.

[43] ECF No. 71.

[44] ECF No. 77-2 at 1178.

[45] ECF No. 71.

At approximately 1:00 a.m. on December 14, 2017, Reid observed that Hayes appeared "bluish" and was breathing heavy in his cell, as if he had sleep apnea, so she asked a nurse to take a look at him.[46] Reid was familiar with sleep apnea because her daughter has it.[47] Reid and Nurse Daniel Layton spoke with Hayes, who was hunched over, and they asked him to lie on the ground out of concern his posture might obstruct his airway and because he might fall and hit his head.[48] After straightening Hayes out, Layton took his pulse and blood pressure readings and indicated they were within normal limits.[49]

Approximately 2 hours later, Officer Kelly noticed that Hayes was looking blue.[50] Kelly informed Reid, and Reid called a medical emergency.[51] A nearby deputy who was a certified EMT, Jessica Slagowksi, entered the cell and saw that Hayes' "face was slightly purple in color."[52] She checked his pulse and respiratory rate and found that both were stable.[53] Reid then cancelled the medical emergency, but asked Nurse Layton to check Reid out anyway.[54] Hayes "woke up, eyes opened and looked around," but he would not respond to questions.[55] Hayes said that he "just wanted to go to sleep."[56] Layton checked Hayes' pulse and blood pressure, which

---

[46] ECF No. 72, Exh. A at HAY0039; ECF No. 73, Exh. H at 27, 28.

[47] *Id.*, Exh. H. at 27–28.

[48] *Id.* at 34–35; *id.*, Exh. N, Layton Depo. at 14.

[49] *Id.*, Exh. N at 15.

[50] *Id.*, Exh. H at 52; ECF No. 72, Exh. A at HAY0049; *id.* at HAY0086–87.

[51] ECF No. 73, Exh. H at 52; ECF No. 72, Exh. A at HAY0049; *id.* at HAY0086, 87. The Farmington City Police Department Officer report is at ECF No. 77-2 starting on page 56.

[52] ECF No. 72, Exh. A at HAY0049; *id.* at HAY0088.

[53] *Id.* at HAY0049; *id.* at HAY0088.

[54] ECF No. 73, Exh. H at 52–53; ECF No. 72, Exh. A at HAY0049; *id.* at HAY0086.

[55] ECF No. 73, Exh. N at 15.

[56] *Id.*, Exh. H at 34.

were consistent with the previous readings taken hours earlier.[57] Layton again straightened Hayes

out so he was not hunched over, at which point his "[c]olor returned to normal" and his

"[b]reathing returned to normal."[58]

Until approximately 5:10 a.m., officers continued to periodically peer into Hayes' cell

from outside the door to check on him.[59] At 5:30 a.m., Officer Kenneth Hatfield checked on

Hayes and found that he did not appear to be breathing.[60] Hayes was not responding to Hatfield

calling his name.[61] Hatfield entered the cell, shook Hayes, and got no response.[62] Hatfield and

Reid called for medical assistance.[63] Officers commenced resuscitative efforts before paramedics

transported Hayes to the hospital where he was pronounced dead shortly after 6:00 a.m..[64] The

medical examiner determined that Hayes' cause of death was "mixed drug toxicity

(buprenorphine, clonazepam, and olanzapine)."[65]

*Davis County Jail Policies*

Davis County Jail maintains policies covering intake of prisoners.[66] Policy 301.04, titled

Prisoners Under the Influence of Alcohol or Drugs, states:

> Incoming prisoners who appear to be heavily under the influence of alcohol or
> drugs will require special attention. Additional security checks will be done on
> these individuals.[67]

---

[57] *Id.* at 17.

[58] *Id.*

[59] ECF No. 71; *see* ECF No. 74 ¶ 133; ECF No. 97 at 11.

[60] ECF No. 72, Exh. A at HAY0087.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.* at HAY0087; *id.* at 94 (noting the time of death was 6:13 a.m.).

[65] *Id.* at HAY0095.

[66] ECF No. 77-2, Exh. B, excerpts from Davis County Correctional Facility Policy and Procedures Manual.

[67] *Id.* at HAY0310, § 301.04(A).

. . .

If a prisoner registers .30% BAC or higher on the Intoxilyzer or by blood analysis, or in cases where the subject refuses the alcohol test and is unable to stand, talk, or perform general motor functions, he will not be accepted into the Facility.[68]

. . .

A prisoner having the symptoms of being under the influence of drugs or alcohol, and who is experiencing withdrawal will be evaluated by medical personnel prior to being admitted.[69]

. . .

Observation checks will be made at intervals not to exceed 15 minutes, and will continue until the prisoner appears to be in a stable or sober condition and or have been evaluated by the medical personnel.[70]

Policy 405.01, titled Receiving Screening, states in relevant part:

Intake screening will be performed on all inmates presented for incarceration at the Davis County Jail. Screening prevents inmates who pose a health or safety threat to themselves or others from being admitted to the facility's general population.[71]

Observation of inmates during the screening may prevent suicide, detect symptoms of drug withdrawals, recognize the signs of trauma the inmate may have received, and if he requires medical attention that would make that inmate medically unacceptable.[72]

. . .

Receiving screening will be conducted during the initial booking process at the Davis County Jail and will be performed by medical staff and/or health trained correctional staff members.[73]

Inmates who cannot walk under their own power could be seriously injured, ill or under the influence of drugs or alcohol. A determination must be made as to

---

[68] *Id.*, § 301.04(A)(1).

[69] *Id.*, § 301.04(A)(2).

[70] *Id.*, § 301.04(A)(3)(a).

[71] *Id.*, at HAY0366, § 405.01.

[72] *Id*.

[73] *Id.* § 405.01(A).

whether the inmate is simply intoxicated or has some disease rendering him immobile. Professional judgment will need to be used in these matters.[74]

. . .

If an inmate seems very confused, if he does not seem to know who he is or where he is or what is happening have him professionally evaluated before acceptance.[75]

. . .

Inmates displaying signs of drug, alcohol abuse or withdrawal should not be accepted until they have been seen and cleared by a physician.[76]

. . .

So when using judgment and common sense, if it is determined the inmate may have a problem, do not accept him until he has been medically cleared.[77]

. . .

Also, if an inmate states that he has taken an overdose of drugs, even if it is not apparent that this is so, do not accept him.[78]

*The Subject Matter Experts*

Dr. Kennon C. Tubbs is a physician who has practiced at the Utah State Prison for 15 years. Dr. Tubbs opined that Baer's initial assessment of Hayes and Layton's evaluation were "reasonable within a degree of medical certainty."[79] Layton made "appropriate clinical decisions" and, generally, the health care provided was "compassionate and rendered promptly."[80] Dr. Tubbs further stated, "It is medically reasonable to not apply a pulse oximeter to

---

[74] *Id.* at HAY0368, § 405.01(I).

[75] *Id.* at HAY0369, § 405.01(L).

[76] *Id.,* § 405.01(M).

[77] *Id.* at HAY0369–70, § 405.01(M)(2).

[78] *Id.* at HAY0370, § 405.01(M)(5).

[79] ECF No. 72, Exh. C, Tubbs Decl. at ¶ 31.

[80] *Id.* at ¶ 33.

a patient with sleep apnea when they improve spontaneously with repositioning and

awakening."[81]

Dr. Glen R. Hanson is a professor of Pharmacology and Toxicology and Vice Dean at the

University of Utah's School of Dentistry.[82] Dr. Hansen opined that Hayes

> died of respiratory failure caused by the combined depressant effects upon his
> Central Nervous System of the medications that he had taken prior to his death,
> the normal deep-sleep period he would have experienced around 5:00 AM on the
> morning of his death, his breathing difficulties, and his increased sensitivity to the
> sedative properties of Buprenorphine, Clonazepam and Olanzapine as a result of
> his discontinued use of or lack of access to these three medications while having
> been incarcerated for a period of almost two-month immediately prior to his
> death.[83]

> Without the overall depressant effect upon his Central Nervous System caused by
> all of the foregoing factors, the levels of Buprenorphine and Clonazepam found in
> Mr. Hayes' blood at autopsy would not in and of themselves have proven fatal to
> him.[84]

Plaintiffs' expert, Dr. Ken Starr, is a physician who is Board-certified in Emergency

Medicine and Addiction Medicine.[85] Dr. Starr's opinion lists five numbered "Deviations from

Appropriate Treatment," including that: (1) Hayes could not have reliably refused care, (2)

medical monitoring was required, (3) medical clearance is "customarily required" and that

"thirty minute checks were never done," (4) there was a vital signs documentation discrepancy,

and (5) "the standard of care is to check pulse oximetry."[86]

Plaintiffs' other expert, Tom Green, is the head of TG Investigations. Mr. Green opines

that "The reception and intake process of the Davis County Correctional Center deviates from

---

[81] *Id.* at ¶ 35.

[82] ECF No. 73, Exh. O, Hansen Decl. at ¶ 1.

[83] *Id.* at ¶ 15(a).

[84] *Id.* at ¶ 15(b).

[85] ECF No. 77-11, Exh. K at 1.

[86] *Id.* at 2-3.

the best correctional practices across the nation."[87] In citing some of the best practice standards, Mr. Green further observes that they are "not constitutionally required."[88] Mr. Green further opines that Davis County personnel did not meet those best practice standards and did not follow all Davis County Jail policies.[89]

## STANDARD OF REVIEW

Reviewing motions for partial summary judgment, the court applies the same standard employed in summary judgment reviews.[90] The court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[91] Where the parties file cross motions for summary judgment, the court may "assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[92]

## DISCUSSION

Plaintiffs' Amended Complaint contains two federal causes of action under 42 U.S.C. § 1983. The first cause of action alleges that Nurse Layton and John Does 1-5 violated Hayes' Eighth and Fourteenth Amendment constitutional rights because they were deliberately indifferent to Hayes' medical needs by failing to provide proper medical care.[93] Plaintiffs have

---

[87] ECF No. 77-12, Exhibit L at 1.

[88] *Id.*

[89] *Id.* at 1-2.

[90] *See Franklin v. Thompson*, 981 F.2d 1168, 1169 (10th Cir. 1992).

[91] Fed. R. Civ. P. 56(a).

[92] *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997).

[93] Amended Complaint, ECF No. 27 at 8–9. Although not identified by name in the Amended Complaint, Plaintiff indicates the Doe Defendants are "Davis County's staff in charge of booking and screening inmates upon arrival." *Id.* at ¶ 12.

since dismissed Layton from the case.[94] The second cause of action alleges that Davis County and Sheriff Richardson violated Hayes' Eighth and Fourteenth Amendment constitutional rights because they were deliberately indifferent to Hayes' medical needs by failing to implement "adequate policies, procedures, or training to their employees or contractors to reasonably provide for the safety and health of inmates, including Gregory, with such issues."[95] In their opposition to Defendants' motion for summary judgment, Plaintiffs stipulated to dismissal of claims against Sheriff Richardson in his official capacity.[96]

## I.     First Cause of Action—Failure to Provide Proper Medical Care

Plaintiffs allege that Davis County booking and screening staff and Nurse Daniel Layton violated Hayes' constitutional rights by exhibiting a deliberate indifference to his serious medical needs.[97]

The Eighth Amendment prohibits the government from inflicting cruel and unusual punishment.[98] The Supreme Court has held that the Eighth Amendment prohibits "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'"[99] "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration."[100] The "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton

---

[94] Order Granting Stipulated Motion to Dismiss Defendant Daniel Layton with Prejudice, ECF No. 59.

[95] ECF No. 27 at 10–11.

[96] ECF No. 98 at 1.

[97] ECF No. 27 at 8–10.

[98] U.S. Const. amend. VIII. This provision is applicable to the states under the Fourteenth Amendment's Due Process clause. *Robinson v. California*, 370 U.S. 660, 666 (1962); *see Graham v. Florida*, 560 U.S. 48, 53 (2010).

[99] *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).

[100] *Id.* at 103.

infliction of pain, proscribed by the Eighth Amendment."[101] "Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment."[102]

To determine whether individual defendants violated Hayes' Fourteenth Amendment rights, the court employs a "two-part Eighth Amendment inquiry when a pretrial detainee alleges deliberate indifference to serious medical needs."[103] This requires an objective and a subjective component. To establish deliberate indifference, a party must make an objective showing that the "harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause,"[104] and the party must also make a subjective showing that the defendants "knew [the prisoner] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."[105] Here, the parties do not dispute that Gregory Hayes' death satisfies the objective standard.[106] Thus, the primary question in the first cause of action is the subjective deliberate indifference component.

Critical to the subjective test, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw

---

[101] *Id.* at 104 (citation and internal quotation marks omitted). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted).

[102] *Barrie v. Grand County, Utah*, 119 F.3d 862, 868 (10th Cir. 1997) (quoting *Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994)).

[103] *Quintana v. Santa Fe County Bd. of Commissioners*, 973 F.3d 1022, 1028 (10th Cir. 2020).

[104] *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citation and internal quotation marks omitted).

[105] *Id.* at 1089 (citation and internal quotation marks omitted). Plaintiffs draw the court's attention to a split among circuits as to the continued viability of a subjective deliberate indifference standard following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *See* ECF No. 98 at 28 n.10. After briefing was completed on the instant motions, the Tenth Circuit definitively held that "deliberate indifference to a pretrial detainee's serious medical needs includes both an objective and a subjective component, even after *Kingsley*." *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020).

[106] *See* Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment, ECF No. 82 at 26 (acknowledging that "Hayes' death satisfies [the objective] requirement").

the inference."[107] The prisoner's symptoms are relevant to this analysis and "[t]he question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"[108] In other words, to show the required deliberate indifference, plaintiff must show that a prison official "knows of and disregards an excessive risk to inmate health or safety."[109]

An "obvious" risk can permit an inference that the risk was known, but only if it would be obvious to a "reasonable" person.[110] However, the Tenth Circuit has held that "characteristics common to many intoxicated individuals do not present an obvious risk."[111]

Before examining the evidence regarding the Davis County personnel, it is important to note that Hayes "died of mixed drug toxicity (buprenorphine, clonazepam and olanzapine)."[112] As indicated above, the record shows that Hayes told jail personnel that he took his prescription clonazepam, but Plaintiffs do not contend that Hayes told them that he had taken the other two medications that combined to cause his death, buprenorphine and olanzapine.

The evidence of record does not suggest that the Davis County personnel knew of facts supporting the inference that Hayes was at "substantial risk of serious harm," that they drew the required inference, and that they recklessly chose to disregard it. The arresting officer, the probation officer, the jail intake officer, the jail observing officers, and the jail nurse had indications that Hayes was under the influence of medication and knew that he had taken his prescription clonazepam, but there is no evidence that they thought he was at substantial risk of

---

[107] *Martinez*, 563 F.3d at 1089 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[108] *Id.* (citation and internal quotation marks omitted).

[109] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[110] *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir. 2005).

[111] *Quintana*, 973 F.3d at 1029 (ellipsis, citation, and internal quotation marks omitted).

[112] ECF No. 72, Exh. A at HAY0063.

serious harm while they recklessly chose not to act. Officer Arnell, who responded to the initial emergency call, observed that Gregory Hayes was "lethargic, groggy, perspiring, and had slurred speech."[113] Hayes said he had taken three clonazepam tablets and two over-the-counter sleeping pills.[114] Arnell arrested Hayes and transported him to the jail where she transferred custody of Hayes to Herndon, Hayes' probation officer.

Herndon had a brief discussion with Hayes in which Hayes said he took two of his prescription clonazepam.[115] Herndon recorded his discussion with Hayes and some of the jail intake that followed. During jail intake, Officer Baer asked Hayes about prescription medications and Hayes described getting one and a half to two pills per day, an 8-milligram pill in the morning and a half or full pill later in the day.[116] Hayes told Baer this was his normal dose.[117] Hayes did not say he had taken sleeping pills and that information was not passed on to either Herndon or Baer from Arnell, though there is no evidence that the information would have influenced their actions.[118] Hayes came in with an empty bottle for his clonazepam and a bottle of Tylenol PM with pills in it,[119] but, as noted previously, he told various officers that he had taken two or three pills. Once in a holding cell, Hayes was observed by intake officers seven times between 8:25 p.m. and midnight.[120]

---

[113] ECF No. 73, Exh. E, Arnell Depo. at 9–10; *id.*, Exh. F, Arnell Police Report.

[114] *Id.*, Exh. E at 25, 26; *id.*, Exh. F.

[115] ECF No. 66, IMG_0671.MOV (video taken by Herndon of a brief discussion with Hayes).

[116] ECF No. 66, IMG_0673.MOV (video taken by Herndon of intake). The video appears to start after the conversation has begun, and Hayes is not recorded identifying the name of the medication he is talking about.

[117] ECF No. 73, Exh. G at 25.

[118] *See id.*

[119] ECF No. 72, Exh. A at HAY0086.

[120] *See* ECF No. 68.

Officer Reid, one of the intake officers, was not present during intake but arrived that evening.[121] Reid testified that information about Hayes' being "under the influence" at intake was passed on to her.[122] Reid had "dealt with Hayes for a long time," so she went to see how Hayes was doing around 1:00 a.m. on December 14, 2017.[123] Finding Hayes bluish in appearance and breathing heavily, Reid called Nurse Layton for an evaluation.[124] Layton was informed that Hayes had been released, rebooked, was "under the influence," and had taken his normal medication.[125] Layton did not remember having a conversation with anyone about the earlier observations of Hayes or any other information about him.[126]

Nurse Layton and the other officers were informed that Hayes took a normal dose of his prescription anxiety medication, and Herndon was informed that Hayes took two clonazepam.[127] Arnell was informed that Hayes took two sleeping pills in addition to three clonazepam.[128] None of the individuals who interacted with Hayes knew that the medication Hayes said he had taken posed a substantial risk of serious harm, much less death. Neither did they know that Hayes also had taken buprenorphine and olanzapine—two of the three drugs identified as contributing to Hayes death—because Hayes did not tell them or anyone else about those medications.[129] Thus, they could not have recklessly disregarded the severity of the risk.

---

[121] ECF No. 73, Exh. H at 20–1, 24–5.

[122] *Id.* 24–5.

[123] *Id.* at 25.

[124] ECF No. 72, Exh. A at HAY0039. Reid described Gregory's breathing as sounding like sleep apnea. ECF No. 73, Exh. H at 27, 28.

[125] ECF No. 73, Exh. G at 12–3.

[126] *Id.* at 13–14.

[127] *Id.*, Exh. F (Arnell Report); *id.*, Exh. G at 24–5; *see id.* Exh. L (Baer Report).

[128] *Id.*, Exh. F; *id.*, Exh. E at 11, 12.

[129] *See* ECF No. 72, Exh. A at HAY0095.

Further, the symptoms of intoxication that these individuals observed were not so indicative of "the necessity for a doctor's attention" that the deliberate indifference standard could nevertheless be satisfied.[130] Arnell noticed that Hayes was "lethargic, groggy, perspiring, and had slurred speech."[131] Herndon observed that Hayes was slow at answering questions and was sweating.[132] Baer testified that it appeared Hayes took his medications, he had to have help putting his hands on the counter in front of him, and that Hayes answered all of Baer's questions perfectly fine.[133] The next observations were of Hayes asleep in an intake cell. Officer Reid and Nurse Layton noticed that Hayes was hunched over, breathing heavy, and appeared bluish.[134] Reid had some experience with sleep apnea and testified that Hayes' breathing sounded like it, and she thought he had sleep apnea.[135] Layton described Hayes as breathing slow, hunched over "occluding his airway."[136] Layton straightened Hayes out and his color and breathing returned to normal, and his pulse and blood pressure were normal.[137] In short, Reid thought Hayes had sleep apnea. Layton thought Hayes needed to change his sleeping position. Hayes' symptoms did not so obviously necessitate different medical attention than that which was provided so that the jail personnel could have been deliberately indifferent to Hayes' needs.[138]

---

[130] *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) ("A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." (citation and internal quotation marks omitted)).

[131] ECF No. 73, Exh. F; *id.*, Exh. G at 10.

[132] ECF No. 72, Exh. D at 33, 35, 36.

[133] ECF No. 73, Exh. G at 29.

[134] ECF No. 72, Exh. A at HAY0039; ECF No. 73, Exh. H at 27, 28.

[135] ECF No. 73, Exh. H at 27.

[136] *Id.*, Exh. N at 14.

[137] *Id.*

[138] The court notes that even a possible misdiagnosis of Hayes, "even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim." *Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (citation and internal quotation marks omitted).

In the record before the court, there is no evidence that the intake or monitoring officers, individually or collectively, were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"—in this case, death—or that they actually drew such an inference and chose recklessly to ignore it.[139] That is, the jail staff were not aware of the full drug ingestion underlying Hayes' condition and they did not infer that it posed a serious risk to Hayes' health. Surveillance video shows that Davis County Jail personnel checked in on Hayes 32 times over the course of the night. When they thought he needed medical attention, they called for it, and he received it.[140] Plaintiffs' expert opines that there were "deviations from appropriate treatment."[141] Arguments that more could have been done, that one or more personnel were negligent, or that medical malpractice allegedly occurred do not by themselves rise to the level of the deliberate indifference standard required for a violation of the Constitution.[142] Accordingly, Defendants' summary judgment motion is granted with respect to Plaintiffs' first cause of action.

---

[139] *Martinez*, 563 F.3d at 1089 (quoting *Farmer*, 511 U.S. at 837).

[140] ECF No. 72, Exh. A at HAY0039.

[141] Plaintiff's expert, Dr. Ken Starr, offers a number of opinions about what should have been done (e.g., Hayes should not have been permitted to decline an ambulance; if 23 clonazepam tablets were ingested, medical monitoring would be needed; thirty-minute checks were not performed; he doubts that the second set of vitals were taken; a pulse oximeter should have been used to supplement heart rate and blood pressure readings). ECF No. 77-11. Exh. K at 2–3. Some of these opinions are speculative and unsupported by record evidence (e.g., 23 clonazepam tablets ingested, no second set of vitals taken). All or virtually all sound in alleged medical negligence. None of them would permit a reasonable jury to find that the Davis County personnel were aware of facts supporting an inference that Hayes was at substantial risk of death, that they drew the required inference, and that they recklessly decided to ignore that risk.

[142] *See Estelle*, 429 U.S. at 105 (explaining that "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain"); *accord Farmer*, 511 U.S. at 835 (noting that *Estelle* "establishes that deliberate indifference entails something more than mere negligence"); *see also Strain*, 977 F.3d at 996 ("Our precedent is clear that a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim." (citation and internal quotation marks omitted)); *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997) (observing that "medical malpractice does not constitute deliberate indifference," and neither does "disagreement in medical judgment" (citations omitted)).

## II.     Second Cause of Action: Failure to Train or Implement Adequate Protocols.

Plaintiffs also allege that Davis County and Sheriff Richardson "failed to train on or implement adequate protocols regarding the medical screening, supervision, and care that must be provided to inmates that present under the influence of drugs."[143] These failures, they contend, showed that "Defendants were deliberately indifferent to the health and safety of [Hayes], which deliberate indifference caused his death.[144]

When a municipality's policies cause a constitutional violation, it may be held liable under 42 U.S.C. § 1983.[145] "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[146] Generally, this is warranted when official policy is "the moving force of the constitutional violation."[147] But a municipality may be liable "only for its own unconstitutional or illegal policies and not for the tortious acts of its employees."[148] That is, a municipality may be liable "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."[149]

---

[143] ECF No. 27 at 10.

[144] *Id*. Plaintiffs allege the same Eighth and Fourteenth Amendment constitutional violations against the County as they did against the individual Defendants. *See* Section I for the analysis of the constitutional requirements of these Amendments.

[145] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–4 (1978).

[146] *Id.* at 694.

[147] *Id.*

[148] *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998); *see* 42 U.S.C. § 1983.

[149] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692).

"To state a claim against a municipal entity in this context, 'plaintiffs must allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference.'"[150] For the purposes of this analysis, a policy or custom may take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.[151]

Plaintiffs allege that "Davis County has liability under the second and fifth prong[s] for widespread practice and lack of training."[152]

Plaintiffs allege that (1) Davis County did not follow its own policies, and (2) Davis County violated national standards regarding medical treatment for inmates. Concerning the latter, Plaintiffs assert:

> The minimal national standard is to have medically trained officers screen these individuals for potential withdrawal or overdose, and subsequently monitor these individuals until cleared by a medical professional. These standards are more or less mirrored in Davis County Jail's written policy, which states: "inmates displaying signs of drug, alcohol abuse, or withdrawal should not be accepted until they have been seen and cleared by a physician." But Davis County does not follow their policy and does not meet national standards.[153]

---

[150] *Crowson v. Washington County Utah*, 983 F.3d 1166, 1184 (10th Cir. 2020) (quoting *Quintana*, 973 F.3d at 1034).

[151] *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations, brackets, and internal quotation marks omitted).

[152] ECF No. 98 at 25–26.

[153] *Id*. at 2.

A. Davis County Jail Policies

Plaintiffs assert that Davis County Jail Policy requires that "inmates displaying signs of drug, alcohol abuse, or withdrawal should not be accepted until they have been seen and cleared by a physician."[154] This excerpt omits important instructions that follow a few sentences later, namely, "It must be a matter of judgment whether or not to accept such an inmate" and that the intake officer should use both "judgment and common sense" about whether to have an inmate "medically cleared."[155] Accordingly, Plaintiffs' argument that the policy categorically requires all inmates showing signs of drug abuse to be cleared by a physician before being held in intake is not supported.

Plaintiffs also contend that Davis County Jail Policy required "requesting information from arresting officers."[156] The Policy does state that "the arresting officer might be able to supply specific information," but it does not state that the intake officer is required to request it.[157] Plaintiffs also do not explain how the failure to ask the arresting officer for specific information in this case amounts to a widespread practice that shows a deliberate indifference to medical needs.

Plaintiffs further state that the Policy requires "rejection if inmate states he overdosed."[158] The policy in question reads as follows: "Also, if an inmates states that he has taken an overdose of drugs, even if it is not apparent that this is so, do not accept him. For example, he may say something like, 'I just took a whole bottle of Valium.'"[159] As noted previously, the video from

---

[154] Id.

[155] ECF 77-2 at HAY0369.

[156] ECF No. 98 at 32.

[157] ECF 77-2 at, HAY369–70.

[158] ECF No. 98 at 32.

[159] ECF 77-2 at HAY0370.

intake shows Hayes telling Baer that he takes one and one half to two tablets of medication each day and that the tablets are 8 milligrams each, for a total of 16 milligrams.[160] And Baer testified that Hayes told her this was his normal dose.[161] He did not state that he had taken an overdose of drugs, whether the "whole bottle" referenced in the Policy or otherwise.[162]

Plaintiffs also argue that the Policy requires "observation checks with an evaluation of consciousness every 15 minutes."[163] Plaintiffs actually are summarizing two policy sections here, one that applies to "prisoners having a blood alcohol content of .20% or higher"[164] and another that applies to inmates that "are incoherent and/or uncooperative."[165] There is no evidence that either policy would have applied to Hayes.

However, there is one jail policy that Plaintiffs identify that may not have been followed. Policy 405.01(A) states: "Receiving screening will be conducted during the initial booking process at the Davis County Jail and will be performed by medical staff and/or health trained correctional staff members."[166] Baer, the intake officer, did not have "medical training," though she did ask "medical questions," applied criteria to determine the inmates' "level of intoxication," and indicated she called medical for support in screening "all the time."[167] Baer

---

[160] ECF No. 66, IMG_0673.MOV (video taken by Herndon of Hayes answering Baer's questions at intake).

[161] ECF No. 73, Exh. G at 25.

[162] Plaintiffs argue elsewhere in their briefing that Hayes "told the screening deputy that he had taken 16 mg of clonazepam (16 times his regular dose), over half the prescription bottle." ECF No. 97 at 3, 24–25; ECF No. 98 at 3. The video shows Hayes tell Baer that he takes "8 milligrams in the morning and usually I take a half to a full, I get two, so I get 16 milligrams a day." ECF No. 66, IMG_0673.MOV. The record evidence does not suggest that Hayes told Baer that he took 16 times his regular dose or over half the prescription bottle, as Plaintiffs suggest. To the contrary, Baer testified that Hayes told her he had taken his "normal dose." ECF No. 73, Exh. G at 25.

[163] ECF No. 97 at 6; ECF No. 98 at 14–15.

[164] ECF 77-2 at HAY0310.

[165] *Id.* at HAY0370-71.

[166] *Id.* at HAY0366.

[167] ECF No. 73, Exh. G at 41; *id.* at 25:6–8. of p. 25.

further testified that, based upon her training and years of experience, intake officers used their judgment to determine the level of a detainee's intoxication, considering such factors as their ability to walk into intake, talk on their own, and answer the intake questions.[168] She stated, "If they can't even follow me with these questions, then I would have called our medical staff to respond."[169] Similar to assessment at intake, Baer testified that not every intoxicated person would be "put on a watch" or more closely monitored.[170] This too was a matter left to the judgment of intake officers.

The record is scant about whether other officers were "health trained" or what "health trained" was intended to mean. Reid indicated that she considered herself "health trained,"[171] that she had "basic drug recognition and CPR" training, but that she had not had other health training "specific for intake."[172] Sergeant Hatfield, who had no medical training, testified that there was formal training involving classes to teach jail personnel to recognize signs of drugs abuse.[173] He also indicated that intake would refer detainees to medical staff, though it was done "rarely."[174] He affirmed that medical staff would be called when, in the judgment of the intake officer, detainees "can't take care of themselves, they can't walk under their own power," or "they obviously need help."[175]

---

[168] ECF No. 77-5, Exh. E at 12–13.

[169] *Id.*

[170] *Id.* at 21.

[171] ECF No. 73, Exh. H at 40–41.

[172] *Id.* at 57–58.

[173] *Id.*, Exh J at 21–22.

[174] ECF No. 77-6, Exh. F at 13. Hatfield testified that he had CPR training. *Id.* at 29.

[175] *Id.* at 14, 15.

The foregoing evidence of record is limited, but it could present a genuine issue of material fact about whether not using "health trained correctional staff members" at intake was a "widespread practice."[176] However, to amount to a potential constitutional violation, Plaintiffs also need evidence of causation and deliberate indifference.[177]

Regarding causation, there is no evidence of record that screening by a "health trained correctional staff member" would permit a finding of causation in this case. Plaintiffs' expert, Dr. Ken Starr, opined that "[i]f poison control or the hospital had been contacted, they would have informed jail staff that this was a life-threatening ingestion."[178] But Starr's opinion does not match up with the policy, which only states that a health-trained correctional staff member will participate in the screening. At screening, Hayes told intake that his medication amounts to "8 milligrams in the morning and usually I take a half to a full, I get two, so I get 16 milligrams a day."[179] There is no record evidence, opinion or otherwise, that suggests that "a health-trained correctional staff member" would have been concerned with Hayes' statement, much less that it would have resulted in them calling poison control or the hospital. In fact, Starr's opinion does not even reference Hayes' statement to Baer about what he said he took (up to 2 tablets, which he said were 8 milligrams each), and instead simply assumes that Hayes must have taken all 23 clonazepam tablets that were returned to him at his earlier discharge.[180] Nor does Starr discuss the toxicology report, which notes that Hayes "died of mixed drug toxicity (buprenorphine,

---

[176] The policy is not clear about when the intake screening must be concluded. It states that the purpose of the screening is to prevent inmates who pose a health or safety threat "from being admitted to the facility's general population." ECF No. 77-2, HAY0366. Hayes never was admitted to the jail's "general population," but was housed in intake all night.

[177] *Crowson*, 983 F.3d at 1184 (quoting *Quintana*, 973 F.3d at 1034).

[178] ECF No. 77-11 at 3.

[179] ECF No. 66, IMG_0673.MOV (video taken by Herndon of Hayes answering Baer's questions at intake).

[180] ECF No. 77-11 at 3.

clonazepam and olanzapine)."[181] As noted previously, Hayes is not alleged to have reported

taking buprenorphine or olanzapine to any of the Davis County personnel. For these reasons,

there is no genuine issue of material fact regarding causation.

The law also requires deliberate indifference for the court to find a constitutional

violation.[182] Depending on the facts of a case, it is possible for a violation of jail policies to

provide evidence of deliberate indifference.[183] Here, Plaintiffs argue that the jail's practice of

admitting inmates without screening by medical staff or health-trained correctional staff shows

deliberate indifference.[184] But Plaintiffs do not cite any cases, binding or otherwise, which found

that a failure to have medical personnel screen every intoxicated inmate constituted the

deliberate indifference required to find a violation of constitutional rights. While that might not

foreclose such a finding on different facts, in this case Plaintiffs' own expert describes Davis

County's lack of screening by a medical professional as a "deviat[ion] from the best correctional

practices across the nation," something which is "not constitutionally required."[185] A failure to

adopt or follow that which an expert deems "best" is not sufficient to find the deliberate

---

[181] ECF No. 72, Exh. A at HAY0095. It is also worth noting that Starr does not assert that the toxicology report permits a finding that Hayes took 23 clonazepam. Conversely, Dr. Glen Hanson, a doctor and professor of pharmacology and toxicology, notes that all of the sedating drugs Hayes took (which includes clonazepam) were "individually within therapeutic ranges." ECF No. 57 at 3. The toxicology report itself states that "Usual therapeutic serum levels of clonazepam range from 10 to 60 ng/mL" and found that Hayes had "2.6 ng/mL." ECF No. 72, Exh. A at HAY0101. It also states that for clonazepam "adult maintenance dosage should generally not exceed 20 mg daily" and that "death due to clonazepam is generally not seen." *Id.* at HAY0102.

[182] *See Crowson*, 983 F.3d at 1184.

[183] *See id.* at 1191 (observing generally that "there must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable," but recognizing a "limited exception where the alleged violation occurred as a result of multiple officials' actions or inactions" (citations omitted)).

[184] ECF No. 97 at 17; ECF No. 98 at 26.

[185] ECF No. 77-12 at 2.

indifference and reckless disregard needed to violate the Constitution. Also, courts have been

clear that negligence-based or medical malpractice arguments alone are simply not enough.[186]

Plaintiffs further argue that *Garcia v. Salt Lake County*, 768 F.2d 403 (10th Cir. 1985)

supports a finding of deliberate indifference here.[187] *Garcia* involved a man who was admitted to

a jail both intoxicated and unconscious, after officers assured a doctor that the man would be

medically observed at the jail.[188] He was not medically observed, remained unconscious, and

died.[189] The jail had a written policy that unconscious prisoners had to be transported to the

hospital.[190] The sheriff also had a written policy that required all unconscious and semiconscious

prisoners be taken directly to the hospital, not jail.[191] Despite those policies, the sheriff testified

that the actual practice was to take unconscious prisoners believed to be intoxicated to jail

instead.[192] The case was tried, and the jury found in favor of plaintiffs.[193] Salt Lake County

appealed and the Tenth Circuit affirmed.[194]

The facts in the instant case are very different from those in *Garcia*. There, a person who

was both intoxicated *and unconscious*, should not have been admitted to jail at all based on

written policy prohibiting such admission.[195] The inmate had only been released by the doctor to

the officers when they said he would be medically monitored, and then he did not receive the

---

[186] *See Estelle*, 429 U.S. at 105; *Strain*, 977 F.3d at 996.

[187] ECF No. 97 at 21.

[188] *Garcia v. Salt Lake County*, 768 F.2d 303, 305–06 (10th Cir. 1985).

[189] *Id.*

[190] *Id.* at 306.

[191] *Id.*

[192] *Id.*

[193] *Id.*

[194] *Id.* at 310.

[195] *See id.* at 305–06.

promised medical monitoring.[196] Here, the video evidence and the testimony all show that Hayes

was conscious, able to walk on his own, and able to have a conversation, despite the medication

he had taken.[197] While it has been held that unconsciousness can constitute an obvious risk,[198]

the Tenth Circuit has distinguished circumstances involving inebriated but conscious and

responsive inmates.[199] In *Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009), the Tenth Circuit

observed:

> Although defendants in *Garcia* were aware that Garcia was unconscious for many
> hours, they took no action to attend to his obvious medical needs. By comparison,
> [the inmate in *Martinez*] was conscious, on his feet, argumentative, and cognizant
> that he was being arrested. [The inmate] exhibited characteristics that are common
> to many intoxicated individuals.[200]

The Tenth Circuit's observations clearly apply in this case as well.

Additionally, there is no record evidence in this case that inmates under the influence of

medication obviously are at excessive risk of serious harm.[201] Accordingly, on the facts of this

case, intoxication did not constitute an obvious risk of death and the fact that Hayes was not

initially screened by medical personnel does not permit a finding that Davis County had actual or

constructive notice that its action or failure to act was substantially certain to result in a

constitutional violation, and it consciously or deliberately chose to disregard the risk of harm.[202]

---

[196] *Id.*

[197] *See, e.g.*, ECF No.73, Exh G at 29; ECF Nos. 66, 67 (recordings made by Herndon of Hayes); ECF No. 71 (jail intake hallway videos); ECF No. 72, Exh. D at 7–8, 35–36.

[198] *Quintana*, 973 F.3d at 1029.

[199] *See Martinez*, 563 F.3d at 1091; *Estate of Duke v. Gunnison County*, 752 Fed.Appx 669, 673–74 (10th Cir. 2018).

[200] *Id.* at 1091 (citation and internal quotation marks omitted).

[201] *See* ECF No. 77-11 at 2–5 (Plaintiffs' expert opines that there were "Deviations from Appropriate Treatment," but does not opine that it is obvious that all intoxicated inmates must be medically screened to avoid an excessive risk of death).

[202] *See* ECF No. 98 at 35 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). Plaintiffs also cite a number of other Tenth Circuit cases as well, but each of them dealt with very different circumstances not present

<u>National Standards</u>

Plaintiffs also contend that "it violated national standards and practices not to screen and clear Gregory prior to admission and subsequently fail to monitor Gregory upon admission."[203] On the facts of this case, this is insufficient for two reasons. First, as noted earlier, Plaintiffs' expert only opines that Davis County "deviates from the best correctional practices across the nation."[204] Again, the standard for whether a violation of constitutional rights has occurred is "deliberate indifference," not deviation from "best" practices. Second, Plaintiffs' expert further notes that those standards are "not constitutionally required."[205] Accordingly, the argument that some of Davis County's practices in this case do not meet national best practice standards does not permit a finding of deliberate indifference and a violation of constitutional rights. Defendants' motion for summary judgment on Plaintiffs' second cause of action is granted.[206]

### III.    The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Cause of Action.

With the dismissal of Plaintiffs' federal causes of action, the only claim remaining seeks relief for unnecessary rigor in confinement under the Utah Constitution.[207] In addition to claims over which it has original jurisdiction, federal district courts "have supplemental jurisdiction

---

here. *E.g.*, *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) (evidence suggested that individual defendant knew plaintiff was suffering severe chest pains and completely refused to help her, while expert testimony established that defendant's conduct was reckless); *Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002) (evidence showed officers received no training on OCD, jail policy contained no information at all about OCD, plaintiff told arresting officers that he had OCD, and officers deprived plaintiff of his OCD medication). Also, in both *Mata* and *Olsen*, plaintiffs requested and were denied medical treatment or medication. *See* Mata, 427 F.3d at 750; *Olsen*, 312 F.3d at 1310. Here, Hayes denied medical treatment offered to him, did not request any medical treatment, and told the nurse that visited him that he just wanted to sleep. *See* ECF No. 73, Exh. E at 11; *id.*, Exh. F; *id.*, Exh. H at 38.

[203] ECF No. 98 at 33.

[204] ECF No. 77-12, Exh. L at 1.

[205] *Id*.

[206] Because no constitutional violation occurred, the court does not reach Defendant Richardson's qualified immunity argument.

[207] ECF No. 27 at ¶¶ 59–67; *see* Utah Const. art. I, § 9.

over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[208] However, district courts may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[209]

Here, the court has dismissed all claims over which it has original jurisdiction.[210] "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[211] Pursuant to statute and Circuit guidance, the court declines to exercise jurisdiction over Plaintiffs' remaining state claim. Accordingly, Plaintiffs' third cause of action is dismissed without prejudice.

## ORDER

For the reasons stated in this Memorandum Decision and Order, Defendants' Motion for Partial Summary Judgment is GRANTED.[212] Plaintiffs' Amended Motion for Partial Summary Judgment is DENIED.[213] Plaintiffs' first and second causes of action under 42 U.S.C. § 1983 are

---

[208] 28 U.S.C. § 1367(a).

[209] 28 U.S.C. § 1367(c).

[210] *See* 28 U.S.C. § 1367(c)(3).

[211] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

[212] ECF No. 74.

[213] ECF No. 97. Plaintiffs' earlier filed Motion for Partial Summary Judgment, ECF No. 75, is terminated.

dismissed with prejudice. Plaintiffs' third cause of action under the Utah Constitution is dismissed without prejudice for lack of jurisdiction.

Signed February 17, 2021.

BY THE COURT

David Barlow
United States District Judge