FILED
United States Court of Appeals
Tenth Circuit

March 21, 2022

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

SUSAN JOHNSON, for herself and on behalf of minor child X.H.; MR. HAYES; THE ESTATE OF GREGORY HAYES,

    Plaintiffs - Appellants,

v.

DAVIS COUNTY; SHERIFF TODD RICHARDSON,

    Defendants - Appellees,

and

DANIEL LAYTON, JOHN DOES 1-5,

    Defendants.

No. 21-4030
(D.C. No. 1:18-CV-00080-DBB)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **EBEL**, and **EID**, Circuit Judges.
_____

After being released from the Davis County Jail, Gregory Hayes was arrested and rebooked into the jail later that same day, where he died hours later due to a toxic combination of drugs he ingested during the short period of his release. Following his death, Hayes's personal representatives and estate sued Davis County and Sheriff

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

Todd Richardson (among others) under 42 U.S.C. § 1983, contending that they infringed Hayes's constitutional right to adequate medical treatment. The district court granted summary judgment to defendants on plaintiffs' federal claims and declined to exercise supplemental jurisdiction over their remaining state-law claim. Plaintiffs appeal, and for the following reasons, we affirm.

## Background

After a two-month stint at the Davis County Jail, Hayes was released with his prescription medications, which included a bottle containing 23 one-milligram clonazepam pills. John Herndon, Hayes's probation officer, had arranged for Hayes to live with his brother. Later that day, Hayes became distraught after learning that his wife was dating someone else. Hayes's brother found Hayes lethargic and groggy, so he called Herndon and informed him that Hayes was high on something and that he did not know what to do. Herndon advised calling 911 for an ambulance.

Hayes's brother made the call, intending to summon an ambulance. But instead, Officer Heather Arnell arrived on the scene. Arnell reported that Hayes was "lethargic, groggy, perspiring[,] and had slurred speech." App. vol. 3, 336. Arnell asked Hayes if he wanted medical attention, but Hayes refused, so Arnell canceled the ambulance that was on the way. Arnell asked Hayes what medications he had taken, and Hayes responded that he had taken three clonazepam and two sleeping pills. Arnell asked if she could see his medicine bottle. She examined the bottle and saw that his prescribed dose was "essentially 1–2 pills as needed for anxiety." *Id.*

When another officer searched Hayes, multiple loose sleeping pills fell out of his pocket.

Arnell contacted Herndon because Hayes may have been abusing prescription medications in violation of his probation order. Arnell and Herndon discussed whether Hayes should be taken to the hospital or back to jail; Herndon ultimately settled on the latter. Accordingly, Arnell arrested Hayes and transported him to the jail. Nothing in the record suggests that Arnell relayed the information she had obtained about Hayes, including the medications he had taken, to the jail staff.

Hayes arrived at the jail with an empty bottle of clonazepam and a partially empty bottle of Tylenol PM. Herndon met Hayes there. According to Herndon, Hayes was "slow at answering," "sweating," and his speech was "[a] little bit" slurred. App. vol. 2, 297. Herndon further testified that Hayes was not aggressive and that his skin complexion appeared normal. At the jail, Hayes told Herndon that he had taken two of his prescription clonazepam immediately after his release. Herndon then asked Hayes if he had taken more later, but jail staff interrupted and took Hayes away before he could answer.

Sergeant Kelcie Baer, who knew Hayes "very well" from his prior stints at the jail, booked Hayes into custody. App. vol. 3, 349. She testified that she was trained to use her judgment when booking intoxicated arrestees. When Baer asked Hayes about his medications, he said that he had taken 16 milligrams of antianxiety medication and that this was his normal dose, although he did not specify the medication. Baer testified that she "could tell that [Hayes] took his medications" and he was

3

"compliant with" her requests. *Id.* at 350. Baer testified that Hayes needed help putting his hands on the counter in front of him but that he otherwise answered her questions without issue, no worse "than any other person that came in [to the jail] under the influence." *Id.* Baer did not ask Herndon what led to Hayes's booking, and she testified that all the information she received came from Hayes. After completing the intake process, Baer gave Hayes a blanket and put him in an intake cell. Although Hayes was not placed on a formal watch, officers periodically checked on him throughout the night by peering through his cell window.

At about 12:45 a.m., Deputy Megan Reid observed that Hayes appeared "blueish" and was breathing heavily in his cell. App. vol. 2, 146. Reid asked Nurse Daniel Layton to check on Hayes. Hayes was hunched over in a manner that was obstructing his breathing, so Layton and Reid straightened out his body. Layton testified that after he and Reid did so, Hayes's breathing returned to normal. Layton took Hayes's pulse and blood pressure, which were in normal range, and "cleared" him. *Id.* Reid testified that Hayes was not following commands and was falling asleep while talking to Reid and Layton, but she said that this behavior was "typical" and "happens every day." App. vol. 3, 373.

Approximately two hours later, around 2:20 a.m., Officer Cheyenne Kelly noticed Hayes was "blue" and "breathing funny." *Id.* at 376. Kelly informed Reid, who again accompanied Layton to check on Hayes. Kelly's report states that Hayes was "oddly breathing" and that after jail personnel entered his cell, he woke up. App. vol. 2, 106. Another officer checked Hayes's pulse, capillary refill, and

4

respiratory rate, all of which were "in a stable range." *Id.* at 109. Layton also checked Hayes's pulse and blood pressure again, and they were consistent with his earlier readings. Layton testified that after he repositioned Hayes, Hayes's color and breathing returned to normal, so Hayes was again cleared.

Until 5:10 a.m., officers continued to periodically look inside Hayes's cell. At about 5:30 a.m., Officer Kenneth Hatfield saw that Hayes did not appear to be breathing. Hayes did not respond when Hatfield called his name. Hatfield entered the cell, shook Hayes, and got no response. Hatfield and Reid called for medical assistance, and deputies performed CPR. Layton nasally administered naloxone, a drug used to counter opioids' effect on the central nervous system, and attached an automated external defibrillator to Hayes's chest. The defibrillator did not recommend that Hayes be shocked, so jail staff continued to perform CPR until paramedics arrived. The paramedics then transported Hayes by ambulance to the hospital, where he died. The medical examiner determined that Hayes died of "mixed drug toxicity" due to three drugs—buprenorphine, clonazepam, and olanzapine. *Id.* at 154.

Plaintiffs sued, asserting several § 1983 claims in their amended complaint. They first alleged that Layton and several unnamed defendants "in charge of booking and screening" at the jail violated Hayes's right to medical care under the Fourteenth Amendment.[1] App. vol. 1, 16. They further challenged the jail's screening policies

---

[1] Plaintiffs frame the underlying constitutional violation as the denial of the right to medical care under the Eighth and Fourteenth Amendments. Since Hayes was

and practices by way of claims against the County (under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978)) and Richardson (as a supervisor in his individual capacity).[2] Plaintiffs also brought a claim under the Utah state constitution.

After discovery, defendants moved for summary judgment on plaintiffs' § 1983 claims, which the district court granted. As to the first claim, it concluded that plaintiffs produced no evidence that the intake or monitoring officers, individually or collectively, were aware of facts from which they could infer that there was a substantial risk of serious harm and thus were not deliberately indifferent.[3] As for the claim against Richardson and the County, it determined that there might be a genuine issue of material fact as to whether the jail had a widespread practice of using staff without health training to conduct intakes. Nevertheless, it concluded that plaintiffs could not establish either the causation or the deliberate indifference required to maintain supervisory- and municipal-liability claims. Last, having dismissed plaintiffs' federal claims, the district court declined to exercise supplemental jurisdiction over plaintiffs' state-law claim.

---

detained at the jail pretrial, his constitutional right to adequate medical care is properly asserted under the Fourteenth Amendment. *See Strain ex rel. Pratt v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020), *cert. denied*, 142 S. Ct. 312 (2021).

[2] Plaintiffs originally asserted an official-capacity claim against Richardson, as well, but they later agreed to dismiss that claim.

[3] The district court's disposition of this claim pertained only to plaintiffs' claims against the unnamed individual defendants because before summary judgment, plaintiffs stipulated to dismissal of their claim against Layton.

Plaintiffs appeal, pursuing their individual-capacity claim against Richardson as a supervisor and their municipal-liability claim against the County. They also request, in the event we reverse the dismissal of any of their federal claims, that we reinstate their state-law claim.

## Analysis

We review the district court's summary-judgment decision de novo, applying the same legal standards as the district court. *Rowell ex rel. Rowell v. Bd. of Cnty. Comm'rs*, 978 F.3d 1165, 1170 (10th Cir. 2020). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 1170–71 (quoting Fed. R. Civ. P. 56(a)). "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Id.* at 1171 (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011)).

We begin with a threshold matter pertaining to plaintiffs' supervisory claim against Richardson. Generally, "[i]ndividual liability under § 1983 must be based on [the defendant's] personal involvement in the alleged constitutional violation." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) (second alteration in original) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). To meet the personal-involvement requirement for a supervisor, a plaintiff must "show an 'affirmative link' between" the supervisor and the alleged constitutional violation. *Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018)

(quoting *Schneider*, 717 F.3d at 767). But when the affirmative link is not premised on the supervisor's personal participation in the alleged constitutional violation—here, a Fourteenth Amendment denial-of-medical-attention claim—"the elements for supervisory and municipal liability are the same." *Burke ex. rel. Williams v. Regalado*, 935 F.3d 960, 999 (10th Cir. 2019). Here, plaintiffs do not contend that Richardson personally participated in any of the events that led to Hayes's death. Rather, their claim against Richardson is premised on the fact that he is "the policymaker responsible for enacting [the jail's] screening practices." Aplt. Br. 62. Thus, our analyses of plaintiffs' supervisory claim against Richardson and plaintiffs' claims against the County merge and proceed in tandem under the municipal-liability framework. *See Burke*, 935 F.3d at 999.

To establish municipal liability under § 1983, a plaintiff must establish "(1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1184 (10th Cir. 2020) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)), *cert. denied* 142 S. Ct. 224 (2021). Municipal-liability claims also require a plaintiff to establish an underlying constitutional violation. *Id.* at 1186 ("[A] claim under § 1983 against . . . a municipality cannot survive a determination that there has been no constitutional violation."). "In most cases," that means a municipality's liability under *Monell* "depend[s] on whether a *specific* municipal officer violated an individual's constitutional rights." *Id.* at 1191 (emphasis added). But when a municipal-liability claim is premised on the municipality's "systemic failure[s]," no

single individual defendant need be found liable. *Id.* at 1192. Rather, "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* at 1186 (quoting *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985)).

Here, plaintiffs do not allege that any individual officer committed a constitutional violation. Instead, they contend that the jail officers' conduct, taken together, amounts to a constitutional violation. As to the official-policy element, plaintiffs challenge the jail's practice of leaving "medical review and observation at intake staff's discretion," Aplt. Br. 43, contending that this practice violates the jail's formal policy, which provides that "[i]nmates displaying signs of drug, alcohol abuse, or withdrawal should not be accepted until they have been seen and cleared by a physician," App. vol. 5, 770. Relatedly, plaintiffs also assert that the intake staff violated another policy by failing to place Hayes under medical observation. And they allege that these practices caused Hayes's denial of medical attention.

For purposes of this appeal, we assume without deciding that plaintiffs have established the required underlying constitutional violation (whether committed by a single individual or collectively), an official policy or custom, and causation. We nevertheless conclude that plaintiffs' claims falter because they cannot establish defendants' deliberate indifference.

In the context of municipal liability, "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Waller v. City & Cnty. of Denver*, 932 F.3d

9

1277, 1284 (10th Cir. 2019) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). Plaintiffs generally establish notice "by proving the existence of a pattern of tortious conduct." *Id.* (quoting *Barney*, 143 F.3d at 1307). Plaintiffs may also rely on unheeded notice from external sources to show that a municipality was deliberately indifferent. *See Burke*, 935 F.3d at 1000–01 (upholding municipal-liability verdict in Fourteenth Amendment medical-care case in which sheriff left deficiencies unaddressed, despite prior warnings by "outside auditors and consultants").

Applying these principles, the district court concluded that plaintiffs could not establish deliberate indifference. It rejected their contention that the jail's practice of admitting individuals without screening by medical staff or health-trained jail staff rose to the level of deliberate indifference or that the County had actual or constructive notice that its acts or omissions were substantially certain to result in constitutional harm. It also rejected plaintiffs' contention that the failure to follow certain national standards for correctional practices amounts to deliberate indifference.

We agree that on this record, no reasonable jury could conclude that defendants were deliberately indifferent. Notably, plaintiffs point to no prior similar constitutional violations that would have put defendants on notice that their screening practices were deficient. *See Waller*, 932 F.3d at 1284. And even if they had pointed

to one, a single "sufficiently similar" constitutional violation "does not describe a pattern of violations" necessary to establish deliberate indifference in the context of municipal liability. *Id.* at 1287 (quoting *Coffey v. McKinley Cnty.*, 504 F. App'x 715, 719 (10th Cir. 2012) (unpublished)); *see also Quintana*, 973 F.3d at 1034 (permitting plaintiff to amend complaint to add allegation that "three other inmates at the same jail recently experienced withdrawal-related deaths"). And unlike in *Burke*, plaintiffs do not point to any external notice that went unaddressed.[4] 935 F.3d at 1000.

To support their contention that their claims against defendants should withstand summary judgment, plaintiffs analogize to our decision in *Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002), arguing that the facts here are even more egregious. We disagree. In *Olsen*, we held that the plaintiff raised a genuine issue of material fact as to whether a county was deliberately indifferent in its failure to train prebooking officers on obsessive compulsive disorder (OCD). 312 F.3d at 1320. The officers in *Olsen* were completely untrained on handling arrestees with OCD, and the jail's mental-health policy manual did not even mention the disorder. *Id.* at 1319. Here, by contrast, there is testimony indicating that officers were trained to look for signs of extreme intoxication, and the jail's policies expressly address how to deal with intoxicated arrestees. And in *Olsen*, the officers "took away" the plaintiff's OCD medication, "even after he informed them that he required it." *Id.* at 1319–20.

---

[4] The absence of any prior constitutional violations is particularly noteworthy given plaintiffs' assertion, apparently drawn from Baer's deposition testimony, that over 95 percent of inmates present as intoxicated when arriving at the jail.

But here, once Hayes showed serious symptoms that required medical attention, he received it. Accordingly, *Olsen* doesn't support plaintiffs' claims.

Moreover, in their attempt to establish deliberate indifference, plaintiffs conflate the deliberate indifference required to establish a claim for inadequate medical care against an individual defendant with the deliberate indifference required to support municipal liability. *See Barney*, 143 F.3d at 1307 n.5 (explaining differing standards of deliberate indifference in these two contexts);[5] *see also Farmer v. Brennan*, 511 U.S. 825, 840–41 (1994) (same). For instance, plaintiffs state that the County's screening practices are "subjectively deliberately indifferent to the needs of intoxicated inmates." Aplt. Br. 45. But only deliberate indifference under the Fourteenth Amendment has a subjective prong (along with an objective one). *Strain*, 977 F.3d at 989. "In the municipal[-]liability context," by contrast, "deliberate indifference is an objective standard." *Barney*, 143 F.3d at 1307 n.5. Thus, plaintiffs' argument about subjective deliberate indifference misses the mark.

At other points, plaintiffs appear to suggest that a municipality can be vicariously liable for the torts of its employees. For instance, plaintiffs contend that a jail official is deliberately indifferent when he or she "'completely denies care although presented with recognizable symptoms which potentially create a medical emergency,'" arguing that "[t]his test binds [the County's] treatment of intoxicated

---

[5] Although *Barney* arose in the Eighth Amendment context, the deliberate-indifference standard for conditions-of-confinement claims is the same "no matter which amendment provides the constitutional basis for the claim." *Strain*, 977 F.3d at 989.

inmates." Rep. Br. 12 (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)). But a municipality "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Plaintiffs' burden is higher than that: They must show that the jail's "policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."[6] *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1195 (10th Cir. 2017) (quoting *Schneider*, 717 F.3d at 769). Plaintiffs fail to make that showing. Accordingly, we affirm the district court's grant of summary judgment on plaintiffs' § 1983 claims against defendants.

As a final matter, because the district court properly granted summary judgment on plaintiffs' federal claims, we reject plaintiffs' request to reinstate their state-law claim and see no abuse of discretion in the district court's decision to dismiss the state-law claim. *See Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1103 (10th Cir. 2020) ("[A] district court should normally dismiss supplemental state[-]law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial." (first alteration in

---

[6] Plaintiffs also assert, as they did below, that violations of national correctional standards set by outside groups constitute evidence of deliberate indifference, pointing to our decision in *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005). But again, the language plaintiffs cite refers to an individual defendant—a "prison health[]care gatekeeper"—not, as here, a municipal defendant. *Id.* at 757. And in any event, standards developed by external groups "simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979).

13

original) (quoting *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002))), *cert. denied*, 141 S. Ct. 1385 (2021).

## Conclusion

Plaintiffs fail to establish that defendants were deliberately indifferent to Hayes's constitutional rights, as required to establish their claims for supervisory and municipal liability. And given the dismissal of plaintiffs' federal claims, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over plaintiffs' state-law claim. Accordingly, we affirm.

                                                Entered for the Court

                                                Nancy L. Moritz
                                                Circuit Judge

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

| | | |
|---|---|---|
| Christopher M. Wolpert<br>Clerk of Court | | Jane K. Castro<br>Chief Deputy Clerk |

March 21, 2022

Mr. Daniel Baczynski
Baczynski Law
12339 South 800 East, Suite 101
Draper, UT 84020

Mr. Tad D. Draper
Tad Draper Law Office
12339 South 800 East, Suite 101
Draper, UT 84020

Mr. Michael W. Homer
Mr. Jesse Carl Trentadue
Suitter Axland
8 East Broadway, Suite 200
Salt Lake City, UT 84111

**RE:**     **21-4030, Johnson, et al v. Davis County, et al**
           Dist/Ag docket: 1:18-CV-00080-DBB

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

CMW/klp